870 F.2d 822
 130 L.R.R.M. (BNA) 2966, 57 USLW 2610,
111 Lab.Cas. P 11,078,
27 Fed. R. Evid. Serv. 860
 UNITED STATES of America, Appellee,
v.
Philip RASTELLI, Nicholas Marangello, Joseph Massino,
Carmine Rastelli, James Vincent Bracco, Charles Martelli,
Charles Agar, Anthony Cantatore, Warren Weissman and Dominic
Mariani, Defendants-Appellants.
 Nos. 1-4, 6-10, 220 and 221, Dockets 87-1057 to 87-1064,
87-1097, 87-1098 and 87-1443.
 United States Court of Appeals,
Second Circuit.
 Argued Oct. 12, 1988.
Decided March 16, 1989.
 
 Frank J. Marine, Atty., U.S. Dept. of Justice, Washington, D.C. (Edward A. McDonald, Attorney-in-Charge, U.S. Dept. of Justice Organized Crime Strike Force, E.D.N.Y., Laura A. Brevetti, Alan M. Friedman, Sp. Attys., Organized Crime Strike Force, Andrew J. Maloney, U.S. Atty., E.D.N.Y., of counsel), for appellee.
 Stanley A. Teitler, New York City (Michael J. Coyle, of counsel), for defendants-appellants Philip and Carmine Rastelli.
 Mark F. Pomerantz, New York City (Ronald P. Fischetti, David T. Grudberg, Warren L. Feldman, Fischetti & Pomerantz, of counsel), for defendant-appellant Joseph Massino.
 Norman A. Olch, New York City (Robert Blossner, New York City, William Lupo, Brooklyn, N.Y., of counsel), for defendant-appellant Nicholas Marangelo.
 Lynne F. Stewart, New York City, for defendant-appellant James Bracco.
 Linda Stagno, New York City (Jonathan Marks, Geoffrey Stewart, Power, Weiss & Marks, of counsel), for defendant-appellant Martelli.
 Louis M. Freeman, New York City (Freeman, Nooter & Ginsberg, of counsel), for defendant-appellant Agar.
 Thomas H. Nooter, New York City (Freeman, Nooter & Ginsberg, of counsel), for defendant-appellant Cantatore.
 Nathaniel Akerman, New York City (Pryor, Cashman, Sherman & Flynn, of counsel), for defendant-appellant Warren Weissman.
 Gerald L. Shargel, New York City (Judd Burstein, of counsel), for defendant-appellant Dominic Mariani.
 Before KEARSE, PRATT, and MAHONEY, Circuit Judges.
 GEORGE C. PRATT, Circuit Judge:
 
 
 1
 Defendants Philip Rastelli, Nicholas Marangello, Joseph Massino, Carmine Rastelli, James Vincent Bracco, Charles Martelli, Charles Agar, Anthony Cantatore, Warren Weissman, and Dominic Mariani appeal from judgments entered against them in the United States District Court for the Eastern District of New York, Charles P. Sifton, Judge, convicting them of various offenses arising from their participation in a wide variety of criminal activities designed to obtain money from the New York moving and storage industry.
 
 
 2
 Because we find no merit in any of the numerous contentions defendants raise on appeal, we affirm the conviction of each defendant on each count upon which he was convicted.
 
 A. BACKGROUND
 
 3
 Seventeen defendants were originally charged in a sixty-four count indictment with leading, managing, and participating in a racketeering enterprise which had as its object the control and use of a union--the International Brotherhood of Teamsters Local 814 Van Drivers, Packers and Furniture Handlers, Warehousemen's and Appliance Home Delivery Union (Local 814)--to obtain money from New York moving and storage companies through various schemes and acts of extortion, rigging bids for government contracts, requiring unlawful employer payoffs, and receiving and making illegal payments to union representatives. In exchange for the payoffs, the companies received, according to the indictment, labor peace, lucrative government contracts, relaxed enforcement of union rules and contracts, and other benefits.
 
 
 4
 The indictment charged that from approximately January 1, 1964, to June 11, 1985, all the appealing defendants operated through an enterprise consisting of individuals from the following four groups "associated in fact" within the meaning of 18 U.S.C. Sec. 1961(4): (1) members and associates of the Bonanno organized crime family which is connected to the nationwide criminal organization known as "La Cosa Nostra"; (2) officers, representatives, members and employees of Local 814; (3) trustees, administrators, representatives, and employees of Local 814's Welfare Fund, Pension Fund, and Annuity Fund; and (4) owners, officers, representatives, and employees of various moving and storage companies and other businesses.
 
 
 5
 Following a six-month jury trial, all appealing defendants except Agar were convicted of conspiring to violate the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. Sec. 1962(d) (1982). Various defendants were also convicted of other substantive crimes including receiving illegal payments from employers in violation of the Taft-Hartley Act, 29 U.S.C. Sec. 186(b)(1) and (d); conspiring to commit extortion, 18 U.S.C. Sec. 1951; making illegal payments to union representatives, 29 U.S.C. Sec. 186(a)(2) and (d); receiving or making payments to influence the operation of an employee benefit plan, 18 U.S.C. Sec. 1954; making false declarations to a grand jury and obstructing justice, 18 U.S.C. Sec. 1623(a) and 18 U.S.C. Sec. 1503; conspiring to violate the Taft-Hartley Act, 29 U.S.C. Sec. 186(a)(2) and (b)(1) and 18 U.S.C. Sec. 1954; and conspiring to commit and committing mail fraud, 18 U.S.C. Secs. 371 and 1341. The jury found the appealing defendants guilty on some charges and not guilty on others.
 
 
 6
 The eight appellate briefs raise thirty-one separate issues for consideration. Having carefully reviewed each contention, we find no merit in any of them; indeed, most of the contentions are not even worthy of discussion. Because of their importance or their novelty in this circuit, however, the following eight issues warrant brief discussion: (1) whether there was sufficient evidence to support certain convictions; (2) whether Bracco and Martelli's convictions for mail fraud were improperly based on the intangible rights theory rejected by the Supreme Court in McNally v. United States, 483 U.S. 350, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987); (3) whether a RICO conspiracy conviction can be based on commission of racketeering acts under an aider and abettor theory; (4) whether the government's loss of allegedly exculpatory tape recordings and bid documents requires reversal of Weissman's convictions; (5) whether a district court may, sua sponte, send the jury back to consider its verdict without first polling them to determine if there is a lack of unanimity when the foreman indicates that there is uncertainty regarding the jury's verdict; (6) whether the government made impermissible use of immunized grand jury testimony; (7) whether a coconspirator's statement explaining the disbursement of extorted money was "in furtherance" of the conspiracy; and (8) whether claims against defendant Marangello are barred by the statute of limitations.
 
 B. DISCUSSION
 1. Sufficiency of the Evidence
 
 7
 Seven defendants claim on appeal that the evidence was insufficient to support the jury's guilty verdicts on specific counts. Although we discuss only the strongest of these claims, we find all to be nonmeritorious.
 
 
 8
 A defendant challenging the sufficiency of the evidence on appeal bears a heavy burden. United States v. Arocena, 778 F.2d 943, 950 (2d Cir.1985), cert. denied, 475 U.S. 1053, 106 S.Ct. 1281, 89 L.Ed.2d 588 (1986); United States v. Losada, 674 F.2d 167, 173 (2d Cir.), cert. denied, 457 U.S. 1125, 102 S.Ct. 2945, 73 L.Ed.2d 1341 (1982). We determine on review only if, viewed in the light most favorable to the government, there is substantial evidence to support the jury's findings. See Glasser v. United States, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942). Furthermore, all issues of credibility must be considered to lie solely within the jury's province, and all reasonable inferences must be drawn in the government's favor. United States v. Friedman, 854 F.2d 535, 553 (2d Cir.1988); United States v. Singh, 628 F.2d 758, 765-66 (2d Cir.), cert. denied, 449 U.S. 1034, 101 S.Ct. 609, 66 L.Ed.2d 496 (1980).
 
 
 9
 a. Knowing Association with the Enterprise
 
 
 10
 Defendants Massino, Weissman, and Cantatore contend that there was insufficient evidence to establish their knowing association with the RICO enterprise, grounding their insufficiency claims primarily on the reasoning of a district court decision, United States v. Castellano, 610 F.Supp. 1359 (S.D.N.Y.1985), which they claim requires the government to prove that each member of a RICO conspiracy is aware of each specific component of the enterprise. Massino, a "capo" or captain in the Bonanno family, argues that there is no evidence that he knew that members of Local 814's pension and welfare fund comprised a component of the enterprise. Weissman, an employee, officer, and representative of a moving company called Deluxe Vans Inc., argues a lack of evidence that he knew that the Bonanno family, by its specific name, was connected to the enterprise. Cantatore, who was at various times an auditor for Local 814's benefit funds and a delegate and organizer for Local 814, also argues that the evidence did not establish his knowledge of the organized crime component.
 
 
 11
 We note first that defendants' arguments are based on a misconception of the Castellano holding. The district court in that case held only as follows:
 
 
 12
 [A]ny defendant prosecuted under section 1962(c) must be shown to have been aware of at least the general existence of the enterprise named in the indictment. * * * [T]he government [must] show, at a minimum, that the defendant was aware of the existence of a group of persons, organized into a structure of some sort, and engaged in ongoing activities, which the government can prove falls within the definition of enterprise contained in section 1961(4).
 
 
 13
 Castellano, 610 F.Supp. at 1401. The court in Castellano went on to find that knowledge of the enterprise could be inferred from evidence of close association with other conspirators with the required knowledge and from participation with members of the enterprise in meetings and activities that furthered the enterprise's affairs. In short, Castellano did not require the government to prove that a defendant knew by name the specific organized crime family involved or the specific components of the enterprise; it required only proof of a defendant's awareness of the general nature of the enterprise.
 
 
 14
 Second, even if Castellano could be construed to require that each member of a RICO conspiracy have specific knowledge of every member and component of the enterprise, that district court ruling would not bind this court. Viewing the argument afresh, we believe such a proposition would be unrealistic in organized crime cases. Focusing on a RICO conspiracy, the government need not prove that a conspirator-defendant agreed with every other conspirator, or knew all the other conspirators, or had full knowledge of all the details of the conspiracy. All that we require is that the defendant agree to commit the substantive racketeering offense through agreeing to participate in two predicate acts, see United States v. Persico, 832 F.2d 705, 713 (2d Cir.1987),cert. denied, --- U.S. ----, 108 S.Ct. 1995, 100 L.Ed.2d 227 (1988), and that he know the general nature of the conspiracy and that the conspiracy extends beyond his individual role. See, e.g., United States v. Friedman, 854 F.2d at 562 ("there is no requirement that each member of a [RICO] conspiracy conspire directly with every other member"); United States v. De Peri, 778 F.2d 963, 975 (3d Cir.1985) (conspirator need not know identity of all coconspirators nor all details of the conspiracy to be found to have agreed to participate in it), cert. denied, 475 U.S. 1110, 106 S.Ct. 1518, 89 L.Ed.2d 916 (1986); United States v. Tillett, 763 F.2d 628, 632 (4th Cir.1985) (government need only prove that "defendant participated in the conspiracy with knowledge of the essential nature of the plan[ ]"); United States v. Pepe, 747 F.2d 632, 659-60 (11th Cir.1984) (government need not establish that each conspirator agreed with all other conspirators, knew his fellow conspirators, or knew all details of the conspiracy in order to prove a RICO conspiracy); United States v. Elliott, 571 F.2d 880, 903-04 (5th Cir.) (government must prove only that RICO conspirator had knowledge of the essential nature of the plan), cert. denied, 439 U.S. 953, 99 S.Ct. 349, 58 L.Ed.2d 344 (1978).
 
 
 15
 We will require no more with regard to a RICO conspirator's knowledge of the enterprise than we have with regard to his knowledge of the overall conspiracy: it is sufficient that the defendant know the general nature of the enterprise and know that the enterprise extends beyond his individual role. See, e.g., United States v. Schell, 775 F.2d 559, 568-69 (4th Cir.1985), cert. denied, 475 U.S. 1098, 106 S.Ct. 1498, 89 L.Ed.2d 898 (1986). See also United States v. Heinemann, 801 F.2d 86, 92 n. 2 (2d Cir.1986), cert. denied, 479 U.S. 1094, 107 S.Ct. 1308, 94 L.Ed.2d 163 (1987).
 
 
 16
 In this case, the general nature of the enterprise involved a group of individuals including employers, union officials, and others who associated together to funnel illegal payments from employers to union representatives through various criminal activities. The record contains overwhelming evidence from which the jury could have found that Massino, Weissman, and Cantatore were aware of this general nature and knew that the enterprise extended beyond the individual role of each. We therefore find the evidence sufficient to establish that each knowingly associated with the RICO enterprise.
 
 
 17
 b. Taft-Hartley Christmas Payoffs
 
 
 18
 Defendants Agar and Cantatore argue that there was insufficient evidence to convict them of receiving, agreeing to receive, or aiding and abetting the receipt of unlawful employer payoffs or "Christmas gifts" in 1979, 1980, and early 1982, in violation of the Taft-Hartley Act, 29 U.S.C. Sec. 186(b). Section 186(b) makes it unlawful for any person to "request, demand, receive, or accept, or agree to receive or accept, any payment, loan, or delivery of any money or thing of value" prohibited by Sec. 186(a). 29 U.S.C. Sec. 186(b). Section 186(a) prohibits employers from paying, delivering, or agreeing to pay or deliver any money or other thing of value to labor union officials who represent the employer's employees or who seek to do so.
 
 
 19
 Agar and Cantatore advance identical claims that the government, in order to expand the number of counts in the indictment, chose to list the Christmas payoffs from different employers in separate counts in the indictment, but then failed to establish that Agar and Cantatore received or agreed to receive the illegal payments from each of the companies listed in the separate counts. This claim is based in part on the fact that the chief government witness, Anthony Giliberti, admitted that beginning in 1979, he kept for himself portions of the employer payments he collected. We hold that the evidence was sufficient to support conviction on each count.
 
 
 20
 Agar and Cantatore were present when the employer payments were distributed in 1979, 1980, and early 1982 and each received a share in accord with the usual procedure. Under that procedure, Giliberti and others collected the payoffs from the employers and gave the money to Charles Martelli, telling Bracco and Martelli which employers had given the money. The money was then put in envelopes which were marked with the initials of the contributing company, and the envelopes were added to the "slush fund" to be distributed during the Christmas season. At meetings in 1979, 1980, and early 1982 held to distribute the money, the money was taken from the envelopes, counted, and divided into stacks. It was then put into other envelopes and distributed to certain organized crime figures as well as to the union officials present, including Agar and Cantatore.
 
 
 21
 True, the evidence on some counts was meager. In fact the trial judge found, in his ruling on forfeitures, that Giliberti in 1979 began pocketing "unspecified portions" of the monies he collected and that "[i]t appears that on some occasions [he] kept all of the money * * * and on other occasions he 'split' the money, putting some in the slush fund and some in his pocket." (emphasis added). Nevertheless, viewing the evidence in the light most favorable to the government, we are satisfied that a reasonable jury could have concluded beyond a reasonable doubt that Giliberti put portions of each payment into the Christmas fund, that Agar and Cantatore actually received shares of each of the employer payments listed in each count of the indictment, and that they knew the identities of the employers.
 
 
 22
 Moreover, the evidence that Agar and Cantatore attended the Christmas distribution meetings, received shares of the money, personally collected some employer payments, and knew that others were collecting similar employer payments was sufficient for the jury to conclude beyond a reasonable doubt that Agar and Cantatore had agreed to receive or accept payments from each employer who contributed; thus it did not matter that some of the payments turned over to their coconspirators may never have reached Agar and Cantatore's hands.
 
 
 23
 c. Bid-Rigging Conspiracy
 
 
 24
 Defendant Agar also argues that there was insufficient evidence to support his conviction on count 27, which charged a conspiracy to rig bids for government contracts in order to decrease competition for the contracts, because there was no evidence that when he collected payoffs from Warren Wagner, Agar was aware of the "bid-rigging purpose" of the payments. We find the evidence more than sufficient to establish Agar's knowledge of the bid-rigging purpose.
 
 
 25
 Existence of and knowing participation in a conspiracy may be established entirely from circumstantial evidence. United States v. Rubin, 844 F.2d 979, 983-84 (2d Cir.1988); United States v. Martino, 759 F.2d 998, 1002-04 (2d Cir.1985); United States v. Sanzo, 673 F.2d 64, 69 (2d Cir.), cert. denied, 459 U.S. 858, 103 S.Ct. 128, 74 L.Ed.2d 111 (1982). Here, the evidence showed that each month from February to June 1980, Agar, at codefendant Bracco's request, collected $2000 from Wagner as Wagner's payment to continue participation in the bid-rigging scheme.
 
 
 26
 In addition, Agar helped Bracco, Wagner, and other conspirators eliminate a competitor of Wagner, called Henley Holmes, which had submitted a lower bid than that of Wagner, by helping Wagner conceal his use of less costly, nonunion labor once Henley Holmes had been eliminated. From the responsibility Agar was given in collecting Wagner's large payments and from Agar's critical role in concealing Wagner's use of nonunion labor after Wagner had received the contract, the jury was entitled to infer that Agar had knowledge of the bid-rigging purpose of the scheme.
 
 2. Mail Fraud
 
 27
 Bracco and Martelli claim that their convictions for mail fraud under count 62 were improperly based on the intangible rights theory rejected by the Supreme Court in McNally v. United States, 483 U.S. 350, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987). They also contend that the mail fraud statute applies only when the misappropriated property flows directly from the victim to the schemer. Both contentions are baseless.
 
 
 28
 In McNally, decided after the trial in this case was completed, the Supreme Court held that the mail fraud statute, 18 U.S.C. Sec. 1341, does not encompass schemes to deprive citizens of the intangible right to honest performance of public duties, but is limited to schemes to deprive citizens of money or property rights. McNally, 483 U.S. 350, 358-59 107 S.Ct. 2875, 2881 (1987). In a later decision, Carpenter v. United States, 484 U.S. 19, 108 S.Ct. 316, 320, 98 L.Ed.2d 275 (1987), the Court explained that although Sec. 1341 is limited to protection of property rights, its protection extends to intangible as well as tangible property rights. Bracco and Martelli complain that the instant indictment and jury instructions permitted the jury to convict on the intangible rights theory proscribed in McNally.
 
 
 29
 In applying McNally, courts have held that where the indictment charges a scheme to defraud which involves dual objectives, one of which is insufficient under McNally, the remaining objective is sufficient to support a mail fraud conviction if, given the totality of the instructions, the jury could have convicted only if it found that the second objective of the fraudulent scheme was to obtain money or property within the meaning of McNally. See, e.g., Ingber v. Enzor, 841 F.2d 450, 455-56 (2d Cir.1988); United States v. Eckhardt, 843 F.2d 989, 996-98 (7th Cir.), cert. denied, --- U.S. ----, 109 S.Ct. 106, 102 L.Ed.2d 81 (1988); United States v. Piccolo, 835 F.2d 517, 518-20 (3d Cir.1987), cert. denied, --- U.S. ----, 108 S.Ct. 2014, 100 L.Ed.2d 602 (1988); United States v. Perholtz, 836 F.2d 554, 556-59 (D.C.Cir.1987). In this case, both the indictment and jury instructions allowed the jury to convict only if they found that an objective of the scheme was to deprive persons of property within the meaning of McNally.
 
 
 30
 Count 62 of the indictment charged dual purposes for the scheme to defraud: (1) to deprive the employees of Van Muli Sportswear Inc. (Van Muli) of "economic benefits they enjoyed through the rights they had under [their] collective bargaining agreement" with the Amalgamated Shirt and Leisurewear Joint Board of the Amalgamated Clothing and Textile Workers Union (Amalgamated); and (2) to deprive the Local 814 union members of the loyal, faithful, and honest services of elected union officials Bracco and Martelli.
 
 
 31
 Although if standing alone the purpose of depriving the Local 814 employees of the loyal, faithful, and honest services of Bracco and Martelli would be invalid under McNally, the purpose of depriving the Van Muli employees of their economic benefits under the collective bargaining agreement sufficiently charged a deprivation of property rights. The government argued and the evidence showed that the coconspirators intended to deprive the Van Muli employees of economic benefits they enjoyed under their collective bargaining agreement with Amalgamated, including jobs, wages, seniority rights, and pension benefits, through an unlawful scheme to oust Amalgamated as the employees' representative and to substitute Local 814.
 
 
 32
 As in Carpenter v. United States, 484 U.S. at ----, 108 S.Ct. at 320, we find that the Van Muli employees were defrauded of much more than the ephemeral right to honest and faithful services of public servants described in McNally. They stood to lose their jobs, wages, seniority rights, and pension benefits. The fact that these economic benefits derived from the employees' rights under the collective bargaining agreement negotiated between Amalgamated and Van Muli does not lessen the employees' property interest in these benefits. An employee's right to economic benefits created in a collective bargaining agreement is an intangible property right the deprivation of which may constitute a violation of the mail fraud statute. See Carpenter v. United States, 484 U.S. at ----, 108 S.Ct. at 320. See also United States v. Boffa, 688 F.2d 919, 930 (3d Cir.1982) (holding that deprivation of "economic benefits [employees] enjoyed through rights they had under the collective bargaining agreement[ ]" constituted property for purposes of the mail fraud statute and intimating that such a deprivation is a deprivation of a tangible property interest), cert. denied, 460 U.S. 1022, 103 S.Ct. 1272, 75 L.Ed.2d 494 (1983); United States v. S & Vee Cartage Co., 704 F.2d 914, 921 (6th Cir.) (corporation's scheme to defraud pension fund, welfare fund, and employees of contributions required under collective bargaining agreement by understating number of employees and amount of contributions is within mail fraud statute), cert. denied, 464 U.S. 935, 104 S.Ct. 343, 78 L.Ed.2d 310 (1983).
 
 
 33
 The critical point is how the trial court submitted these issues to the jury. Had the jury been permitted to find guilt based on either one of the two charged objectives, we would be required to reverse under McNally. See United States v. Ruggiero, 726 F.2d 913, 921 (2d Cir.), cert. denied, 469 U.S. 831, 105 S.Ct. 118, 83 L.Ed.2d 60 (1984). However, the district court carefully instructed the jury that in order to convict it had to find both of the charged objectives. In its instructions, the district court read to the jury count 62, which alleged both objectives and set them forth in the conjunctive. The court specifically instructed the jury that to convict on that count it had to find "the existence of the scheme to defraud as described in the charge " (emphasis added). The court then specifically added that the scheme must be "intended to deprive somebody of money, property or other thing of value by means of fraudulent pretenses, representations or promises." Thus, we are assured that in rendering its verdict on this count the jury found beyond a reasonable doubt that Bracco and Martelli acted under a scheme to deprive others of money or property within the meaning of McNally.
 
 
 34
 Finally, contrary to Bracco and Martelli's contentions, the mail fraud statute does not require a showing that the misappropriated property flow directly from the victim to the schemer. McNally imposed no such requirement, but required only that the object of the fraudulent scheme be the misappropriation of money or property. Carpenter v. United States, 484 U.S. at ----, 108 S.Ct. at 320. We have previously held that the government need not even show that the defendants personally benefited from the scheme. See, e.g., United States v. Weiss, 752 F.2d 777, 784-85 (2d Cir.), cert. denied, 474 U.S. 944, 106 S.Ct. 308, 88 L.Ed.2d 285 (1985).
 
 
 35
 We now hold that the money or property obtained in a scheme to defraud under the mail fraud statute need not flow directly from the victim to the schemer. It is sufficient on this record that defendants Bracco and Martelli were to receive payment for their role in helping defraud the Van Muli employees of the economic benefits guaranteed under their collective bargaining agreement.
 
 
 36
 3. RICO Liability Based on Aiding and Abetting the Pattern of Racketeering
 
 
 37
 Massino claims that a RICO conspiracy conviction cannot be based on an agreement to commit racketeering acts as an aider and abettor. We do not agree.
 
 
 38
 The jury found by special interrogatories that Massino agreed to participate in the commission of racketeering acts 47-52 and 69-71 which charged that Massino, Philip Rastelli, Carmine Rastelli, and representatives of Local 814, Bracco, Martelli, Agar, and Cantatore, did "request, demand, receive and accept, and agree to request, demand, receive and accept the payment of money" from employers in the New York moving and storage business in violation of 29 U.S.C. Sec. 186(b)(1) and (d)(2) and 18 U.S.C. Sec. 2. Because Massino, a capo in the Bonanno family, was neither an employer nor a union representative, he could not be found primarily liable under Sec. 186, but could be and was convicted on these counts as an aider and abettor. Massino does not challenge the sufficiency of the evidence that he aided and abetted the violations of Sec. 186 charged as predicate acts, nor his convictions on substantive counts of aiding and abetting violations of Sec. 186. He argues only that a RICO conspiracy conviction cannot be based solely on participation as an aider and abettor of racketeering acts. This claim is without merit.
 
 
 39
 We have previously held that a defendant who agrees personally to commit at least two predicate acts may be convicted of a RICO conspiracy violation. United States v. Persico, 832 F.2d 705, 713 (2d Cir.1987), cert. denied, --- U.S. ----, 108 S.Ct. 1995, 100 L.Ed.2d 227 (1988); United States v. Teitler, 802 F.2d 606, 612-13 (2d Cir.1986). In Teitler, 802 F.2d at 613, we emphasized that "[i]t is fundamental that criminal conspiracy is an agreement among two or more persons to commit a crime. The crime of conspiracy does not require actual commission of the substantive crime." We adhere to the concept that agreement among coconspirators is the critical element of a RICO conspiracy and hold that it is irrelevant whether a defendant agrees to commit the racketeering acts as a principal or as an aider and abettor. If a defendant agrees personally to commit, or to aid and abet the commission of, two predicate acts he may be convicted of a RICO conspiracy violation. See United States v. Cauble, 706 F.2d 1322, 1341-42 (5th Cir.1983), cert. denied, 465 U.S. 1005, 104 S.Ct. 996, 79 L.Ed.2d 229 (1984). There is no question as to Massino's agreement. The jury found by special interrogatories that Massino agreed to participate in each of racketeering acts 47-52 and 69-71. Because Massino does not challenge the sufficiency of the jury's findings with respect to at least six of these, acts 47-52, the fact of agreement is established. Massino contends, however, that he did not agree as a principal, but at most as an aider and abettor, and for that he cannot be held criminally liable under RICO.
 
 
 40
 Case law unequivocally establishes, however, that a defendant may be convicted of a RICO conspiracy violation if he aids and abets the commission of racketeering acts. See United States v. Daly, 842 F.2d 1380, 1389-92 (2d Cir.) (court affirms RICO conspiracy conviction since there is sufficient evidence to show that defendant committed one predicate act and aided and abetted a predicate Taft-Hartley offense), cert. denied, --- U.S. ----, 109 S.Ct. 66, 102 L.Ed.2d 43 (1988); United States v. Qaoud, 777 F.2d 1105, 1117-18 (6th Cir.1985) (defendant was properly convicted on substantive and conspiracy RICO offenses given evidence that he aided and abetted predicate acts involving bribery), cert. denied, 475 U.S. 1098, 106 S.Ct. 1499, 89 L.Ed.2d 899 (1986); United States v. Cauble, 706 F.2d 1322, 1339-41 (5th Cir.1983) (RICO conspiracy conviction upheld where evidence was sufficient to show that defendant agreed to commit or aid and abet predicate acts of smuggling and where evidence was sufficient to establish beyond a reasonable doubt that defendant aided and abetted the predicate acts), cert. denied, 465 U.S. 1005, 104 S.Ct. 996, 79 L.Ed.2d 229 (1984); see also United States v. Wyatt, 807 F.2d 1480, 1482-83 (9th Cir.) (defendant who received income from a pattern of racketeering activity need not even have aided and abetted the predicate acts to be found guilty of a RICO substantive violation under 18 U.S.C. Sec. 1962(a)), cert. denied, --- U.S. ----, 108 S.Ct. 170, 98 L.Ed.2d 124 (1987).
 
 
 41
 Courts have also held in civil RICO cases that defendants can be liable for RICO violations upon proof that they aided and abetted the predicate acts. See Petro-Tech, Inc. v. Western Co. of North America, 824 F.2d 1349, 1356 (3d Cir.1987) ("[I]f all of RICO's other requirements are met, an aider and abettor of two predicate acts can be civilly liable under RICO."); United States v. Local 560 of International Brotherhood of Teamsters, 780 F.2d 267, 288-89 and n. 25 (3d Cir.1985) ("We conclude that under RICO, an individual need not himself commit two requisite predicate offenses, as long as that same individual aids and abets the commission of the predicate offenses."), cert. denied, 476 U.S. 1140, 106 S.Ct. 2247, 90 L.Ed.2d 693 (1986).
 
 
 42
 Accordingly, Massino was properly convicted of conspiracy to violate RICO.
 
 4. Missing Evidence
 
 43
 Defendant Weissman contends that his conviction should be reversed because the government lost three allegedly exculpatory tape recordings of conversations of government witness Warren Wagner recorded on October 19, 1978, and October 20, 1978, and also lost certain bid documents by moving companies regarding a contract to move the Federal Bureau of Investigation (F.B.I.) from East 69th Street to 26 Federal Plaza. Weissman claims primarily that the missing tapes were exculpatory because they would have shown that Wagner deviated from his 1985 grand jury testimony by eliminating explicit reference to the term "bid-rigging" after learning that the tapes were missing and because Weissman was not prosecuted for bid-rigging immediately after the taped conversations. He further asserts that the lost bid documents were "important" in order to determine whether the competition joined to rig bids.
 
 
 44
 To succeed on a claim that missing evidence would play a significant role in his defense and was thus "material", a defendant must meet the two-pronged materiality standard established in California v. Trombetta, 467 U.S. 479, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984) as well as show that the government acted in bad faith. Under the Trombetta materiality test, the "evidence must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." Id. at 489, 104 S.Ct. at 2534.
 
 
 45
 Because Weissman failed to meet either condition of the Trombetta materiality test, his lost evidence claim must fail. See, e.g., United States v. Dela Espriella, 781 F.2d 1432, 1437-38 (9th Cir.1986); United States v. Webster, 750 F.2d 307, 331-34 (5th Cir.1984), cert. denied, 471 U.S. 1106, 105 S.Ct. 2340, 85 L.Ed.2d 855 (1985). First, neither the missing tapes nor the bid documents contained exculpatory evidence that was apparent before they were lost. Weissman's argument that government witness Wagner used the specific term "bid-rigging" in his grand jury testimony but not in trial testimony falls far short of establishing that the tapes had an exculpatory value that was apparent before the tapes were lost, particularly in light of the fact that F.B.I. summaries of the taped conversations made by agents monitoring the conversations did not contain exculpatory material.
 
 
 46
 Likewise there is no evidence that the missing bid documents provided exculpatory evidence. Even if, as Weissman contends, the bids were higher than Weissman's, such evidence standing alone would be as probative of Weissman's guilt as of his innocence since it would be evidence of the success of the bid-rigging scheme in setting up Weissman's bid as the lowest.
 
 
 47
 Even if the missing evidence had been exculpatory, Weissman also failed to meet the second requisite of the Trombetta test; he did not show that he could not have "obtain[ed] comparable evidence by other reasonably available means." Trombetta, 467 U.S. at 489, 104 S.Ct. at 2534. As to the tapes, Weissman had ample opportunity to obtain and use comparable evidence but failed to do so. He could have used the contemporaneously prepared F.B.I. summaries of the tape-recorded conversations or he could have called as a witness F.B.I. agent Mullaney who monitored the taped conversations. With regard to the lost bid documents, Weissman could have subpoenaed copies from the moving companies or their representatives. Having failed to use these reasonably available means of obtaining comparable evidence, Weissman may not now complain that the failure of the government to preserve the tapes and bid documents violated his due process right to a fair trial.
 
 
 48
 Finally, the record is barren of proof that the government lost the evidence in bad faith. On this ground alone, the missing-evidence claim must fail. The Supreme Court recently held that "unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law." Arizona v. Youngblood, --- U.S. ----, 109 S.Ct. 333, 337, 102 L.Ed.2d 281 (1988). Accord Trombetta, 467 U.S. at 488, 104 S.Ct. at 2533 ("In failing to preserve [evidence], the officers here were acting 'in good faith and in accord with their normal practice.' " (citations omitted)).
 
 5. Refusal to Accept Initial Jury Verdict
 
 49
 Defendant Agar asserts that the district court erred in not accepting as final the jury's originally announced verdicts as to him. In the middle of the jury's report on its verdicts the foreman stated that there was something wrong with his interpretation of the verdicts, and the court sent the jury back for further deliberation without first polling the jury to determine if there was a lack of unanimity.
 
 
 50
 Some background to this claim is necessary. Count one of the indictment charged the RICO conspiracy violation and listed 103 predicate racketeering acts; counts 2-64 largely incorporated and realleged many of the predicate acts as separate counts of the indictment. To assist the jury in these complexities, the court provided a written form in which it called for separate verdicts for each defendant on each count, and in addition set forth special interrogatories to determine in connection with count one which racketeering acts were committed by specific defendants.
 
 
 51
 After two weeks of deliberation, the jury indicated by note that it was ready to report its verdicts. In the courtroom, the foreman began announcing, in response to questions from the clerk, the verdicts as to each defendant on each of the first 19 counts (except counts 5 and 8 which had been dismissed and were not given to the jury). He reported some of the defendants to be guilty on each count except count 16. Agar was reported to be not guilty on each count up through count 19. When they reached count 19, however, the judge interrupted and directed the clerk to ask the foreman, beginning with count 16, to announce as well the jury's findings on the racketeering predicate acts that corresponded to the substantive counts. The court, thus, wanted to obtain, at the same time, the jury's findings on the substantive counts and on the parallel racketeering acts.
 
 
 52
 After reporting the jury's findings with respect to certain racketeering acts, the foreman, apparently perceiving an inconsistency or uncertainty in the jury's work, stated, "There is something wrong with my interpretation of one whole--". At this point, the judge interjected,
 
 
 53
 Perhaps then it would be better if you retired to consider the question further and then reconvene again.
 
 
 54
 Ladies and gentlemen, you may retire to consider your verdict for this matter.
 
 
 55
 The jury retired. After approximately four hours of further deliberation, during which the jury sent several notes to the judge seeking clarification on various points of law, including the interrelationship of the RICO conspiracy, the predicate acts, and the substantive counts, the jury finally reported back, with the foreman indicating that some of its previously announced verdicts had been changed. It now found Agar guilty on counts 2-4, 6, 7, and 9-15 and not guilty on counts 1 and 16-19.
 
 
 56
 Agar contends that the originally reported verdicts that he was not guilty on counts 1-19 should be considered final because, he claims, under Fed.R.Crim.P. 31(a) a jury verdict is final when announced unless there is a poll of the jury revealing lack of unanimity as authorized in Fed.R.Crim.P. 31(d). We reject both Agar's premise that a jury verdict is automatically final when announced by the foreman, as well as his conclusion that the judge erred in directing the jury to deliberate further without first polling them.
 
 
 57
 First, it is well established that the jury's verdict is not final until the "deliberations are over, the result is announced in open court, and no dissent by a juror is registered." United States v. Taylor, 507 F.2d 166, 168 (5th Cir.1975). See also United States v. Nelson, 692 F.2d 83, 84-85 (9th Cir.1982); United States v. Chinchic, 655 F.2d 547, 550 (4th Cir.1981), cert. denied, 471 U.S. 1135, 105 S.Ct. 2674, 86 L.Ed.2d 693 (1985); United States v. Love, 597 F.2d 81, 85 (6th Cir.1979); 3 Wright, Federal Practice & Procedure: Criminal Sec. 517, at 32 (2d ed. 1982).
 
 
 58
 Second, a district judge has authority to require redeliberation in cases in which there is uncertainty, contingency, or ambiguity regarding the jury's verdict. Agar correctly recognizes that rule 31(d) expressly authorizes a district court to require further deliberation when a poll of a jury shows lack of unanimity:
 
 
 59
 When a verdict is returned and before it is recorded the jury shall be polled at the request of any party or upon the court's own motion. If upon the poll there is not unanimous concurrence, the jury may be directed to retire for further deliberations or may be discharged.
 
 
 60
 Fed.R.Crim.P. 31(d). Contrary to Agar's assertions, however, the language of rule 31(d) does not delimit the only circumstance in which a trial judge may require redeliberation. The rule focuses on the need for unanimity, but it does not address the equally important needs for clarity and certainty as to the meaning of the verdict being reported. Absent clear language requiring it, rule 31(d) should not be read to preclude a district court from taking immediate corrective action where, as here, the jury's verdict is patently uncertain. The court in United States v. Morris, 612 F.2d 483, 489 (10th Cir.1979), for example, noted that even though rule 31(d) does not expressly give the trial judge the power to repoll the jury, a judge may repoll upon the appearance of uncertainty in the verdict. The Morris court stated the principle succinctly as follows:
 
 
 61
 In any case upon the appearance of any uncertainty or contingency in a jury's verdict, it is the duty of the trial judge to resolve that doubt, for "there is no verdict as long as there is any uncertainty or contingency to the finality of the jury's determination." (citations omitted) (emphasis added).
 
 
 62
 See also 3 Wright, Federal Practice and Procedure: Criminal Sec. 517, at 36 (2d ed. 1982) (a court has no discretion to record a verdict as long as there is doubt or uncertainty as to whether the verdict is valid); United States v. Mears, 614 F.2d 1175, 1179 (8th Cir.), cert. denied, 446 U.S. 945, 100 S.Ct. 2174, 64 L.Ed.2d 801 (1980) (where jury foreman read verdict of "not guilty" and then told court that verdict was incorrectly signed, court properly directed jury to resume deliberations after which jury returned a verdict of guilty).
 
 
 63
 Here, when the foreman, before completing his reading of the verdicts from the form of verdict, stated "[t]here is something wrong with my interpretation of one whole--", he was announcing that at least he was uncertain as to what the jury's verdicts actually were. Uncertainty and ambiguity being clear, no poll was necessary at this point, nor should the court have attempted to secure a final, partial verdict, at least until the ambiguity and uncertainty were cleared up. Furthermore, it would have been questionable, perhaps risky to the whole case, to have invited the jury's comment on the uncertainty in open court. Therefore, Judge Sifton's prompt action in sending the jury back to further consider the verdicts was proper. It was necessary that they clarify the situation so that the foreman could concisely report clear verdicts on which they all agreed.
 
 
 64
 In these circumstances it would be error to consider as final the verdicts that had been reported by the foreman before the jury was sent back to further consider its verdicts. No polling of the jury had occurred, and in light of the foreman's announced uncertainty in the verdicts, polling at that point would not have been appropriate. In short, we reject Agar's contentions on this issue.
 
 6. Use of Immunized Grand Jury Testimony
 
 65
 Mariani contends that his convictions for perjury and obstruction of justice under counts 54 and 55 of an earlier indictment, No. 85-CR-00354, should be reversed because the government made impermissible nonevidentiary use of his immunized grand jury testimony in securing the convictions.
 
 
 66
 On June 10, 1985, the grand jury returned indictment 85-CR-00354 (the first indictment) charging Philip Rastelli and 16 other defendants with participation in a RICO conspiracy and other substantive offenses in order to corrupt Teamsters Union Local 814. Because Mariani had testified under a grant of immunity before the grand jury that returned the first indictment, he could not be indicted on the RICO conspiracy charge or other substantive charges by that grand jury, see United States v. Hinton, 543 F.2d 1002, 1010 (2d Cir.) (same grand jury that hears immunized testimony may not indict defendant, after he testifies, on charges of criminal participation in matters before the grand jury), cert. denied, 429 U.S. 980, 97 S.Ct. 493, 50 L.Ed.2d 589 (1976); but he was charged in counts 54 and 55 with perjury and with obstruction of justice, based on his allegedly false testimony before the grand jury about his role as a coconspirator and beneficiary of the conspiracy. Thereafter, a separate grand jury that did not hear Mariani's immunized grand jury testimony returned indictment 86-CR-00015 (the second indictment) charging Mariani with the RICO conspiracy, conspiring to commit extortion, making illegal payments to a union representative, and making illegal payments to influence the operation of an employee benefit fund. These charges mirrored those in the first indictment against other defendants.
 
 
 67
 The two indictments were consolidated for trial. Following the verdict, the trial court held that the second indictment had been premised on improper use of Mariani's immunized grand jury testimony. Mariani now argues that the court impermissibly relied on the tainted second indictment as a ground for refusing to sever the perjury and obstruction of justice counts and that the tainted second indictment further prejudiced him because it made him a RICO defendant and thus denied him the benefit of limiting instructions to prevent the jury from considering, as against him, the highly prejudicial proof of organized crime activities used in establishing the organized crime component of the RICO enterprise.
 
 
 68
 This claim fails for two reasons. First, on the government's appeal of the district court's finding that the second indictment was premised on improper use of immunized grand jury testimony and thus "tainted", a prior panel of this court reversed the district court order and remanded for reinstatement of Mariani's convictions and sentence, holding that the government had met its heavy burden of showing that the second indictment and the convictions were derived from sources entirely independent of Mariani's immunized testimony. United States v. Mariani, 851 F.2d 595, 596, 600 (2d Cir.1988). Thus, the district court did not err in considering the second indictment, which charged Mariani with participation in the RICO conspiracy and other crimes, when it refused to sever counts 54 and 55 from the rest of the case. Nor did it err in allowing the jury to consider the evidence of organized crime with regard to Mariani.
 
 
 69
 Second, 18 U.S.C. Sec. 6002, the grand jury immunity statute, specifically permits immunized testimony to be used in "a prosecution for perjury, giving a false statement, or otherwise failing to comply with the [immunity] order." See also United States v. Apfelbaum, 445 U.S. 115, 131, 100 S.Ct. 948, 957, 63 L.Ed.2d 250 (1980) ("[N]either [18 U.S.C. Sec. 6002] nor the Fifth Amendment precludes the use of respondent's immunized testimony at a subsequent prosecution for making false statements[ ]"); United States v. Seltzer, 794 F.2d 1114, 1120-21 (6th Cir.1986), cert. denied, 479 U.S. 1054, 107 S.Ct. 927, 93 L.Ed.2d 979 (1987).
 
 
 70
 Accordingly, we affirm Mariani's convictions for perjury and obstruction of justice.
 
 7. Admissibility of Coconspirator Statement
 
 71
 Marangello claims that the trial court erred in "admitting, as an exception to the hearsay rule, an out-of-court statement by codefendant Charles Martelli that Marangello was receiving the money obtained in the Eletto extortion conspiracy." Under Fed.R.Evid. 801(d)(2)(E), a declaration is an admissible, nonhearsay statement if "[t]he statement is offered against a party and is * * * a statement by a coconspirator of a party during the course and in furtherance of the conspiracy." Marangello argues principally that Martelli's statement is inadmissible under 801(d)(2)(E) because it was not made in furtherance of the conspiracy and because there was insufficient evidence linking Marangello to the extortion conspiracy. Marangello also asserts that even if the statement is admissible under the coconspirator exception, the government failed to prove Marangello's guilt in the conspiracy beyond a reasonable doubt. We disagree with each assertion.
 
 
 72
 a. "In Furtherance" Requirement
 
 
 73
 Marangello claims that Martelli's out-of-court statement that Marangello was receiving the two checks that came from the Joseph Eletto conspiracy was simply a narrative of what happened to the money after it was extorted from Eletto which did not advance the interests of the conspiracy and thus was not in furtherance of the conspiracy. This contention is without foundation.
 
 
 74
 A trial court's determination that a coconspirator statement is "in furtherance" of the conspiracy is essentially a question of fact which will not be disturbed on appeal absent a finding that the determination was clearly erroneous. United States v. Persico, 832 F.2d 705, 716 (2d Cir.1987), cert. denied, --- U.S. ----, 108 S.Ct. 1995, 100 L.Ed.2d 227 (1988); United States v. Rahme, 813 F.2d 31, 36 (2d Cir.1987). The statement by Martelli, made in response to coconspirator Giliberti's direct question about what was happening to the proceeds of the Eletto extortion conspiracy, furthered the conspiracy to extort money from Eletto in several ways. First, a statement among coconspirators which " 'provide[s] reassurance, serve[s] to maintain trust and cohesiveness among them, or inform[s] [them] of the current status of the conspiracy further[s] the ends of the conspiracy * * * ' ". Rahme, 813 F.2d at 35-36 (quoting United States v. Ammar, 714 F.2d 238, 252 (3d Cir.), cert. denied, 464 U.S. 936, 104 S.Ct. 344, 78 L.Ed.2d 311 (1983)); Persico, 832 F.2d at 716. Martelli's statement that Marangello was receiving the money served all three of these functions: it provided reassurance to Giliberti about the disposition of the extorted money; it served to maintain trust and cohesiveness among Giliberti and his coconspirators; and it informed Giliberti of the current status of the conspiracy.
 
 
 75
 In addition, Martelli's statement also served other functions which have been found to satisfy the "in furtherance" requirement. The statement "apprised [Giliberti] of the progress of the conspiracy"; Persico, 832 F.2d at 716 (citing United States v. Rahme, 813 F.2d 31, 35 (2d Cir.1987)); it informed Giliberti of the identity and activities of his coconspirators, id. at 716 (citing Rahme, 813 F.2d at 36); United States v. Perez, 702 F.2d 33, 37 (2d Cir.), cert. denied, 462 U.S. 1108, 103 S.Ct. 2457, 77 L.Ed.2d 1336 (1983); and it informed Giliberti what was being done with the proceeds of the conspiracy. United States v. Rosenthal, 793 F.2d 1214, 1245 (11th Cir.1986), cert. denied, 480 U.S. 919, 107 S.Ct. 1377, 94 L.Ed.2d 692 (1987). Accordingly, we hold that the trial court's finding that Martelli's statement was "in furtherance" of the conspiracy was not clearly erroneous.
 
 
 76
 b. Evidence Linking Marangello to Conspiracy
 
 
 77
 Marangello also charges that there was insufficient evidence linking him to the conspiracy to admit Martelli's statement under Fed.R.Evid. 801(d)(2)(E). He argues that the only evidence of his participation in the conspiracy was Martelli's coconspirator statement. According to Bourjaily v. United States, 483 U.S. 171, 175-76 107 S.Ct. 2775, 2778-79, 97 L.Ed.2d 144 (1987), in ruling on the admissibility of a coconspirator statement under Fed.R.Evid. 801(d)(2)(E) a trial court must find by a preponderance of the evidence that a conspiracy existed and that both the declarant and the defendant were part of that conspiracy. In making this determination, the court may consider the coconspirator's statement itself. Id. at 180-81 107 S.Ct. at 2781-82.
 
 
 78
 Again, we review only to determine if the trial court's finding of Marangello's nexus to the conspiracy was clearly erroneous, and again we conclude that it was not. Martelli's statement that Marangello was receiving the proceeds of the Eletto conspiracy was itself strong evidence of Marangello's connection to the conspiracy. But that was not the only evidence. It was Marangello who in 1976 arranged for the Bonanno family to buy out the interests of the Genovese family in Local 814 for $10,000 a year, and thereby to become the recipient of the Eletto payments. Shortly thereafter in 1977, Giliberti and Bracco demanded, under threat of labor problems, that Eletto pay them, the representatives of the Bonanno family, the money he had formerly been paying to Earl Coralluzo of the Genovese family. From Marangello's responsibility in arranging for the Bonanno family rather than the Genovese family to receive the payments made to Local 814, it could be inferred that Marangello was also aware of the nature of the payments he was putting at the Bonanno family's disposal. Finally, when Giliberti asked Marangello if he was receiving the Eletto payments, Marangello denied only that he was getting the payments, but admitted that whenever he did "a favor for these people [he] would get something." Combined, this evidence tended to establish Marangello's knowing participation in the conspiracy.
 
 
 79
 Accordingly, the trial court's finding that there was sufficient evidence linking Marangello to the conspiracy was not clearly erroneous.
 
 
 80
 c. Sufficiency of the Evidence
 
 
 81
 Finally, Marangello argues that even if Martelli's statement is admissible under rule 801(d)(2)(E) as a coconspirator statement made in the course of and in furtherance of the conspiracy, there was insufficient evidence for the jury to find guilt beyond a reasonable doubt. We disagree. As noted above, a defendant who challenges the sufficiency of the evidence bears a very heavy burden. Martelli's statement that Marangello was receiving the payments from the Eletto extortion conspiracy, together with Marangello's admission that if he ever did "a favor for [Eletto, he] would get something", and Marangello's pivotal role in shifting control of Local 814 from the Genovese family to the Bonanno family provide sufficient evidence from which a reasonable jury, drawing the inferences most favorably to the government, could have concluded beyond a reasonable doubt that Marangello was guilty.
 
 8. Statute of Limitations
 
 82
 Marangello also contends that his convictions on count one, the RICO conspiracy, and count 26, the Eletto extortion conspiracy, must be reversed because the evidence was not sufficient to meet the standard set in the trial court's statute-of-limitations instruction to the jury, which Marangello acknowledges was more favorable to him than the law required. The RICO conspiracy charge has a five-year limitations period. 18 U.S.C. Sec. 3282. The district court charged in part that since the indictment had been filed on June 11, 1985, the government had to prove that "the defendant committed or agreed to commit at least two racketeering acts * * * [and] that at least one of these racketeering acts occurred or was to occur wholly or in part on or after June 11, 1980."
 
 
 83
 As the trial court recognized in its ruling on post-trial motions, and as this court subsequently held in United States v. Persico, 832 F.2d at 713-14, this instruction was erroneous. A particular defendant need not commit or agree to commit a racketeering act within the five year limitations period. Id. Instead, as with other conspiracies, the crime of RICO conspiracy is not complete until the purposes of the conspiracy have been accomplished or abandoned, and the government need only prove that the conspiracy continued to within five years of the indictment. Id.
 
 
 84
 Nevertheless, the government's evidence was sufficient to meet even the more demanding standard set forth in the charge to the jury. Above all else, it is clear that the instructions did not require that Marangello himself act within the limitations period. Instead the instructions required only that Marangello agree to commit two racketeering acts, at least one of which was to occur within five years of the indictment. Thus, the fact that there is no evidence that Marangello personally acted after 1979 is not dispositive.
 
 
 85
 The racketeering acts with which Marangello was charged were all aiding and abetting violations of the Taft-Hartley Act, 29 U.S.C. Sec. 186(b) and 18 U.S.C. Sec. 2, i.e., aiding and abetting the receipt of unlawful employer payments. The record shows (1) that Marangello participated in a continuing conspiracy to receive illegal payoffs annually from employers in violation of the Taft-Hartley Act; (2) that from 1975-1978, Marangello aided and abetted the receipt of unlawful employer payoffs from Cirker Moving and Storage Company and Certified Moving and Storage Company; (3) that from 1976-1978, Marangello aided and abetted the receipt of unlawful employer payments from Joseph Eletto Transfer Company, Benny's Moving and Storage Company, Clancy-Cullen Storage Company, Inc., and Wagner Moving and Storage Company; (4) that Marangello was the "underboss" or second-in-command in the Bonanno crime family and accordingly was responsible for approving and supervising the criminal activities of the Bonanno family; (5) that until 1979 Marangello personally supervised Anthony Giliberti who played a major role in collecting the unlawful employer payments; (6) that each year from 1975-1978 Marangello received shares of the annual employer payoffs; (7) that the conspiracy was of a continuing nature without any contemplated termination; and (8) that the continuing pattern of collecting unlawful employer payments, established under Marangello's supervision, continued at least until 1982, well into the limitations period.
 
 
 86
 From Marangello's supervisory role in this continuing conspiracy to annually receive employer payments prohibited by the Taft-Hartley Act, the jury could have concluded that even though he may have done nothing after 1979, Marangello did agree to participate personally in racketeering acts of obtaining unlawful employer payments which did occur and were intended to occur after June 11, 1980.
 
 
 87
 Second, in addition to the conspiracy, the jury could have found that Marangello actually aided and abetted predicate Taft-Hartley violations that occurred or were to occur after June 11, 1980. Since each racketeering act with which Marangello was charged was an aiding and abetting violation of the Taft-Hartley Act, the period of limitations began to run against him only when each crime or racketeering act he aided and abetted was complete. United States v. Erb, 543 F.2d 438, 446 (2d Cir.), cert. denied, 429 U.S. 981, 97 S.Ct. 493, 50 L.Ed.2d 590 (1976). By supervising the criminal activity of key participants in the Taft-Hartley violations and helping establish the organization and system that enabled members of the conspiracy to collect unlawful payments annually from specified employers in the time before the limitations period and to continue collecting from these employers into the limitations period, Marangello aided and abetted Taft-Hartley violations charged as predicate acts that were not complete until within the limitations period.
 
 
 88
 Accordingly, Marangello's conviction on the RICO conspiracy charge was not time-barred.
 
 
 89
 With respect to count 26, the Eletto extortion conspiracy, the court instructed the jury that the government had to prove that "the offense occurred wholly or in part on or after June 11, 1980." We conclude that this instruction did not require that each defendant act within the limitations period. The offense charged in count 26 was a conspiracy among Philip Rastelli, Marangello, Massino, Bracco, and Martelli to knowingly and unlawfully combine and agree with each other to obstruct, delay, and affect interstate commerce by extorting property from Joseph Eletto through the fear of financial and economic injury. Neither the indictment nor the jury charge required that any particular person act within the limitations period.
 
 
 90
 The trial court's instructions required only that the offense--the conspiracy to extort payments from Joseph Eletto in violation of 18 U.S.C. Sec. 1951--continue into the limitations period. The government presented overwhelming evidence that the conspiracy continued and that Joseph Eletto continued to make extortionate payments until well after June 11, 1980. Therefore, Marangello was properly convicted on the count 26 extortion charge.
 
 C. CONCLUSION
 
 91
 The judgments of conviction are affirmed as to all defendants.