Nemiah SOANES, Arthur Hawke, Vincent Fuentes, George Schwartz, George Rosenfeld, John Economos, as Trustees of Retail Local 906 AFL–CIO Welfare Fund, Plaintiffs,

v.

EMPIRE BLUE CROSS/BLUE SHIELD, Defendant.

EMPIRE BLUE CROSS/BLUE SHIELD, Third–Party Plaintiff,

v.

LOCAL 906 AFL–CIO, The Associated Members Brokerage Group, Inc., The American Employee Group Benefits Administrator, Inc., The Greater Northeast Business Group, Inc., Solomon Sprei, Herbert Lieber, and Nemiah Soanes, Third–Party Defendants.

Morton NATHAN, Peter Janis and Lorinda Thomas, Individually and on behalf of the Local 906 AFL–CIO Welfare Fund, and Nemiah Soanes, Althea Neblett, Vincent Fuentes, George Schwartz, George Rosenfeld and John Economos,

as Trustees of Retail Local 906 AFL–CIO Welfare Fund, Plaintiffs,

v.

EMPIRE BLUE CROSS/BLUE SHIELD, Defendant.

The AMERICAN EMPLOYEE GROUP BENEFITS ADMINISTRATOR, INC., Plaintiff,

v.

EMPIRE BLUE CROSS/BLUE SHIELD, Defendant.

EMPIRE BLUE CROSS/BLUE SHIELD, Third–Party Plaintiff,

v.

LOCAL 1–J HEALTH FUND A & B, Local 1–J of the Service Employees International Union, The Associated Members Brokerage Group, Inc., Solomon Sprei, Herbert Lieber, and Oswald Gutierrez, Third–Party Defendants.

Solomon SPREI and Steven Adler, Plaintiffs,

v.

EMPIRE BLUE CROSS/BLUE SHIELD, Defendant.

Nos. 91 Civ. 8698(JES), 92 Civ. 0223(JES), 92 Civ. 0422(JES), and 92 Civ. 0423(JES).

United States District Court, S.D. New York.

July 7, 1997.

Hershkowitz & Goldweber, Trustees of Local 906 Welfare Fund, Local 906 Welfare Fund, Nathan, Janis and Thomas, Mineola, NY (Max Goldweber, of counsel), for Plaintiffs.

Kornstein Veisz & Wexler, New York City (Daniel J. Kornstein, of counsel), for Defendant Empire Blue Cross/Blue Shield.

Snow Becker Krauss P.C., New York City (William D. Hummell, of counsel), for Third-Party Defendants Local I–J Health Fund A & B, Local I–J of the Services Employees International Union.

## OPINION AND ORDER

SPRIZZO, District Judge.

Plaintiffs, trustees of an employees' union fund, bring the above–captioned action *Soanes, et al. v. Empire Blue Cross/Blue Shield,* 91 Civ. 8698(JES) (*"Empire I"*), against defendant Empire Blue Cross/Blue Shield ("Empire"), a not–for–profit health insurer. Plaintiffs claim, *inter alia,* that Empire breached a health insurance contract ("contract 82079") and a written stipulation, violated N.Y. Ins. Law §§ 2402 and 2403, engaged in deceptive acts and practices prohibited by N.Y. Gen. Bus. Law § 349, and breached certain fiduciary duties. See Amended Complaint ("Am.Compl.I") ¶¶ 15, 19, 31, 34, 37. Plaintiffs seek enforcement of contract 82079 or, in the alternative, return of the insurance premiums paid thereunder. *See id.* ¶ 27; Plaintiffs' Supplemental Post–Trial Memorandum of Law ("Pltf. Memo.") at 10.

In *Empire I,* Empire filed counterclaims based in fraud, breach of contract and alleging violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961(1), (5), 1962(a)–(d). In addition, Empire brings a third–party action against the employees' union, Retail Local 906 AFL–CIO ("Local 906"), Nemiah Soanes ("Soanes") in his capacity as president of Local 906, and three corporations: The Associated Members Brokerage Group, Inc. ("AMBGI"), The American Employee Group Benefits Administrator, Inc. ("AEGBA"), and The Greater Northeast Business Group, Inc. ("GNEBG"). Empire also asserts counterclaims and third–party claims against three individual defendants, Solomon Sprei ("Sprei"), Herbert Lieber ("Lieber"), and Soanes. In the third–party action, Empire asserts claims sounding in fraud, breach of contract, tortious interference with contract, and violation of and conspiracy to violate RICO. *See Empire I* Amended Answer and Counterclaims ("Am.Ans.I") ¶¶ 139, 142, 145, 167–74, 178, 182–83, 187–88, 192–93, 197–98. On December 27, 1991, pursuant to 28 U.S.C. § 1441, the third-party defendants therein removed *Empire I* to this Court from the New York State Supreme Court.

Plaintiffs Morton Nathan, Peter Janis and Lorinda Thomas (collectively, the "individually insured plaintiffs") bring the instant related case, *Nathan, et al. v. Empire Blue Cross/Blue Shield,* 92 Civ. 0223(JES) (*"Empire II"*), claiming that Empire violated §§ 404, 406, and 409 of the Employee Retirement Income Security Act ("ERISA"), and breached its fiduciary duties in violation of 29 U.S.C. §§ 1104, 1106, and 1109 by refusing to pay out claims filed under contract 82079. *See* Pretrial Order ("PTO") ¶ 1 at 6. The individually insured plaintiffs seek payment of all valid claims under contract 82079, or, in the alternative, the return of premiums paid thereunder. *See id.* ¶¶ 2–4 at 6. In addition, the individually insured plaintiffs' request, *inter alia,* an accounting of all funds received

**234**

and all claims paid by Empire related to contract 82079. *See id.* ¶¶ 5–9 at 6–7.

Plaintiff AEGBA brings the above–captioned related action, *AEGBA v. Empire Blue Cross/Blue Shield,* 92 Civ. 0422(JES) (*"Empire III"*) against Empire. In *Empire III,* Empire brings third–party claims against Local 1–J, Sprei, Lieber and others. Sprei and Steven Adler bring a fourth related action, *Sprei, et al. v. Blue Cross/Blue Shield,* 92 Civ. 0423(JES) (*"Empire IV"*), against Empire.[1]

The four above–captioned actions were consolidated for a bench trial. After summations and post–trial briefing, the Court resolved several issues on the Record. As to the remaining issues, for the reasons set forth below, the Court holds that Empire established RICO and fraud liability as to Sprei, Lieber, AMBGI, AEGBA and GNEBG. However, Empire's claims against Soanes, Local 906 and the Local 906 Fund are dismissed. In addition, Empire is directed to return a portion of the premiums collected under contract 82079 with interest to be deposited with the Clerk of the Court pending the commencement of an appropriate action for distribution to the individual insureds thereunder.

## BACKGROUND

AMBGI, AEGBA, and GNEBG (collectively, the "corporate defendants"), through its principals and officers Solomon Sprei and Herbert Lieber, acted as administrators of various labor unions' health insurance programs. See Transcript of Trial Record dated April 25, 26, 27 and May 5, 1994 ("Tr.") at 471; Trial Exh. A ¶¶ 3–7. As administrators, these entities collected premiums from unions or individual insureds, made premium payments to their insurers, oversaw the processing of claims and certifications of eligibility, and attended to various other ministerial financial matters. *See* Tr. at 471–73, 481, 502–03.

On behalf of AMBGI, AEGBA, and GNEBG, Sprei approached insurers to arrange for health insurance coverage of union members. See Tr. at 21–23, 481–82, 498, 553–56. AMBGI acted as a "finder" of individuals who would become members of a union for the sole purpose of obtaining insurance through that union's group coverage. See Tr. at 343–47. As finder, AMBGI would allocate customers to different unions depending on whether the customer was seeking individual or family coverage. *Id.* at 234. AMBGI, through Lieber, executed agreements with a number of "subfinders" who recruited membership from the general public to join a health insurance plan. See Tr. at 471–73. These members of the general public made premium payments to the subfinder, who reserved a portion of that payment as his fee. *Id.* at 347; PTO, Undisputed Facts ¶ 35. The subfinder would then forward the balance to AMBGI. *See* Tr. at 347; PTO, Undisputed Facts ¶ 35. After taking its fee, AMBGI paid the remaining funds either to the union directly in the form of dues, or to the union administrator who, in turn, paid membership dues. *See* Tr. at 344–49.

Local 1–J is the Service Employees' International Union of New York, New York ("Local 1–J"), *see* Trial Exh. CM at 2, an affiliate of the Jewelry Manufacturers Association and its welfare fund ("the Local 1–J Fund"). *See* Trial Exh. BS; PTO ¶ 2 at 7. In 1988, the trustees of the Local 1–J Fund attempted unsuccessfully to procure a suitable health insurance contract for its members, all of whom were at that time engaged in the trade. *See* Tr. at 549–50, 553. As a result, these Local 1–J members continued to be insured through the union's Taft–Hartley self–insurance plan. *See* Tr. at 563.

In early 1990, Sprei approached the Local 1–J Fund about recruiting "associated members" from the general public, who would receive family health insurance coverage from Empire.[2] *See* Tr. at 553. In soliciting

---

1. Empire has settled all claims against Local 1–J Union and Welfare Fund as well as Local 1–J related individual defendants Steven Adler and Oswald Gutierrez. *See* Post–Trial Brief of Empire Blue Cross/Blue Shield ("Deft. Brief") at 2.

2. Unlike "regular members," "associated members" were members of the general public who had no connection to the trade or labor function of the Local 1–J union. Associated members are also referred to as "associate members" throughout the instant proceedings.

coverage from Empire, however, Local 1–J, through Sprei, submitted to Empire claims histories reflecting only regular members who were engaged in the union trade. *Id.* at 392–95, 560–62. Based upon evidence elicited at the trial, it appears that Empire was unaware of the scheme to recruit associated members when it issued coverage of all Local 1–J members under group health insurance contracts 82074 and 82075 from April 1, 1990 through May 1, 1991.

After obtaining these group health insurance contracts from Empire, Local 1–J agreed to allow Sprei, Lieber, and AEGBA to administer the contracts and to recruit associated members for insurance under these contracts. *See* Am. Ans. I ¶¶ 98–100; Trial Exh. A ¶¶ 8, 11–12. When Empire requested certification of claimants' eligibility under contracts 82074 and 82075, the Local 1–J Fund, Sprei and Lieber falsely reported them to Empire as regular members of Local 1–J, when, in fact, they were associated members. *See* Trial Exh. Y.

Local 906 is the Retail Drug, Cigar, Soda and Luncheonette Store Employees Union. *See* Trial Exh. D. The Retail Local 906 AFL–CIO Welfare Fund ("Local 906 Fund") was created in 1956 as a jointly administered Labor Management Trust Fund. *See* Tr. at 13, 29; PTO, Undisputed Facts ¶ 11. At all times relevant to the instant actions, Nemiah Soanes, Arthur Hawke,[3] Vincent Fuentes, George Schwartz, George Rosenfeld and John Economos served as Trustees of the Local 906 Fund (collectively the "Local 906 Trustees"). *See* PTO, Undisputed Facts ¶ 1. Soanes also acted as an administrator of the Local 906 Fund and had served as president of Local 906 since 1979. *See* Tr. at 12–14.

As a part of its union practice, Local 906 trustees allocated employer contributions to the Local 906 Fund to pay for premiums on various group insurance policies for its members, including group life, accident and health insurance. *See* Am. Ans. I ¶ 45. Through its trustees, the Local 906 Fund negotiated and entered into contracts to provide group insurance policies at discounted rates. *Id.* ¶¶ 51, 58.

In July 1965, Empire first issued group contract number 80542 ("contract 80542") providing hospitalization insurance for Local 906 members, all of whom were at that time employed in the retail drug, soda, cigar and luncheonette industry (hereinafter referred to as "regular members"). *See* Tr. at 17; PTO, Undisputed Facts ¶ 13. Contract 80542 was renewed annually for twenty–five years and was last renewed in June 1990. *See* PTO, Undisputed Facts ¶ 13.

Beginning in or about 1988, Local 906 membership began to decline, resulting in diminishing union dues, revenues and depleting union assets. *See* Tr. at 77–78; Trial Exhs. AK–1 to AK–3. Soanes realized that unless he found a way to reverse this trend, his position and salary as Local 906 President would be in jeopardy. *See* Tr. 79–80. In the summer of 1990, Sprei contacted Soanes and offered to find new members for Local 906. *See id.* at 80–81; Trial Exh. A ¶ 55. Soanes viewed Sprei's offer as a possible solution to the problem of dwindling union assets. See Tr. at 19, 72, 77–78, 80–81. Sprei proposed that these new members would become "associated members" of Local 906. *Id.* at 22–23. On October 17, 1990, apparently without the knowledge of the Local 906 Trustees, Soanes caused the constitution of Local 906 to be amended to include a membership provision for associated members. *See id.* at 23, 128–29; PTO, Undisputed Facts ¶ 27.

Thereafter, Sprei, Lieber, and AMBGI recruited Local 906 associated members from the general public. *See* Am. Ans. I ¶¶ 60–61; Trial Exh. A ¶ 21. Associated members joined Local 906 solely to obtain health insurance under a group policy in the Local 906 Fund's name.[4] *See* Tr. at 22–23, 499. Soanes, Sprei and Lieber knew that, unlike regular members of Local 906, the new associated members were not required to work in

---

**3.** Arthur Hawke also appears as Arthur "Hawks" on various documents filed herein.

**4.** The increased dues revenues from new associated members in Local 906 resulted in, *inter alia,* a 50% salary increase for Soanes and a significant increase in union assets. *See* Tr. at 72–75; Trial Exh. AJ–1, AJ–2; PTO ¶¶ 20–24 at 28–30.

the retail drug, soda, cigar and luncheonette industry or even to be employed at all. *See* Am. Ans. I ¶ 64; Tr. at 108, 117–18, 243–44, 257.[5]

In September 1990, Soanes contacted Empire and requested information about expanding the Local 906 Fund's health insurance to include both hospitalization and major medical coverage for a new group of 282 people. *See* Tr. at 144–45, 278–79; PTO, Undisputed Facts ¶ 18. Soanes did not disclose to Empire that this new group consisted of associated members only, rather than regular members, or that his estimate of 282 enrollees was pure conjecture. *See* Tr. at 145; Transcript of Trial Record dated September 23, 1994 ("Sept.1994 Tr.") at 11–13. Nor did Soanes reveal the fact that contract 82079, the policy to be issued relating to this coverage, would insure only associated members whereas Empire had up until that time insured only regular members.[6] *See* Sept. 1994 Tr. at 11–12, 130, 137–138; Trial Exh. N.

On October 12, 1990, Soanes prepared the application for contract 82079 on behalf of the Local 906 Fund, in which he falsely represented that employer contributions would be 100% of premium payments, even though the members themselves, and not their employers, paid premiums directly to the finders. *See* Tr. at 127, 131–32; Trial Exh. 4 at 1. The employers of associated members, if any, neither contributed to the Local 906 Fund nor entered into a collective bargaining agreement with Local 906, as employers of regular members were required to do. *See* Trial Exh. D. Moreover, while regular members had equal privileges in Local 906, associated members were not entitled to vote on union affairs, hold union offices or otherwise participate in the union. *See* Tr. at 87–88; Trial Exh. D.

Based upon the Local 906 Fund's application, Empire offered the Local 906 Fund premium rates far below those it would have charged the general public. *See* Tr. at 378–379, 420, 443. However, when over 4,000 associated members signed up for group insurance under contract 82079, the premiums

5. On behalf of Local 906, Soanes entered into a Finder Agreement with AMBGI which provides:
 The Union acknowledges and agrees that the Finder [AMBGI] shall be permitted to engage in or own an interest in other business ventures of every kind and description, including, but not limited to, acting as a finder for other groups or unions which may be competitive herewith, and that the Union shall have no rights by virtue of this Agreement in such independent ventures or to the income or profits derived therefrom.
 Exh. S. at 12. On behalf of Local 906, Soanes also entered into an Administration Agreement with AEGBA which provides:
 The Union acknowledges and agrees that the Administrator [AEGBA] shall be permitted to engage in or own an interest in other business ventures of every kind and description, including, but not limited to, the administration of benefits for other groups or unions, which may be competitive herewith, and that the Union shall have no rights by virtue of this Agreement in such independent ventures or to the income or profits derived therefrom.
 Exh. T at 6.

6. At trial, although Soanes and Lieber suggested that Empire employee Timothy Neal had been aware of the associated membership scheme from at least the time the parties entered into contract 82079, the evidence established only that Neal was the Empire agent in charge of the Local 906 Fund account, and that Neal prepared

the application for contract 82079 for signature by Soanes and submission to the department at Empire in charge of setting the premium rates. *See* Tr. at 31. Neal was never called as a witness at trial, according to counsel, because he had taken the Fifth Amendment in response to questions posed during his deposition. However, the testimony in which Neal claimed the Fifth Amendment was never offered at trial nor was the Court requested to draw an adverse inference with respect to Empire's knowledge of the fraudulent scheme based upon the invocation of that privilege. The Court has recently been notified that Sprei has been convicted of federal charges related to the instant case. During his plea allocution, Sprei alleged, inter alia, that Neal had received bribes in exchange for his assistance in effectuating the scheme.

Although applicable law might permit knowledge of the fraud to be imputed to Empire based upon Neal's knowledge, *see, e.g., Allard v. Arthur Andersen & Co.*, 924 F.Supp. 488, 494–95 (S.D.N.Y.1996) (applying New York law); *Center v. Hampton Affiliates, Inc.*, 66 N.Y.2d 782, 784, 497 N.Y.S.2d 898, 488 N.E.2d 828 (1985), the deposition in which Neal took the Fifth Amendment was never made a part of the Record. *See, e.g., Brink's Inc. v. City of New York*, 717 F.2d 700, 708–09 (2d Cir.1983). Nor is Sprei's conviction and/or plea allocution part of the instant Record. Therefore, the Court cannot rely upon this evidence as a basis for deciding this case.

calculated for the policy no longer reflected the real cost of claims or the cost of administering the contract.[7] See Tr. at 398–399.

Contract 82079 provided for coverage from November 1, 1990 until June 30, 1991. See PTO, Undisputed Facts ¶ 21. The monthly premiums under contract 82079 were $147.79 for individual coverage and $364.30 for family coverage. See id. ¶ 24. AEGBA administered union dues and premium payments from the new associated members and, after deducting commissions, tendered the payments to Local 906 and the Local 906 Fund.[8] See id. ¶ 35; Trial Exh. A ¶¶ 27, 61.

Soanes affirmatively concealed the existence of the associated members from Empire and government agencies. Thus, in regular sworn filings with the Internal Revenue Service and the Department of Labor relating to membership, Soanes reported only regular membership figures and withheld all information and statistics relating to associated members of Local 906. See Tr. at 90–97. Specifically, Soanes listed the number of active participants in the Local 906 Welfare Fund as 201 as of January 1991. See id. at 100–01; Exh. I at 2. Nevertheless, for that same month, Soanes represented to Empire in a group contract remittance form accompanying premium checks that 2,080 members participated in the Local 906 Fund. See Tr. at 100–01; Trial Exhs. FT, FU.

In addition, Sprei, Lieber and the corporate defendants interchangeably used the Local 1–J and Local 906 contracts with Empire to maximize revenues. Through its principals, AMBGI allocated its customers to either Local 906 or Local 1–J based on whether the customer was seeking individual or family coverage. Sprei offered coverage through Local 1–J under contracts 82074 and 82075 only to families. Under those contracts, the monthly premium for either individual or family coverage was $253.35. See Trial Exh. CP at 1–3. However, the monthly premium for individual coverage under contract 82079 through Local 906 was $147.79. See PTO, Undisputed Facts ¶ 24. Therefore, Sprei sold coverage under contract 82079, with its lower individual coverage rate, to individual associated members and Sprei sold coverage under contracts 82074 and 82075, with their lower family coverage rate, to associated members who desired family coverage. See Tr. at 234;[9] Deft. Brief at 20.

From November 1, 1990 through June 30, 1991, Empire mailed forms to the Local 906 Fund requesting eligibility certification for each person submitting a claim to Empire under contract 82079. See PTO, Undisputed Facts ¶¶ 37–40. A clerical employee at Local 906 processed and mailed hundreds of forms to Empire certifying that claimants under contract 82079 were eligible for coverage, even though they were associated members. See Tr. at 172; Trial Exh. Y; PTO, Undisputed Facts ¶¶ 40–41. At trial Soanes testified that he considered a member—associated or regular—to be eligible for coverage if the member had paid his dues. See Tr. at 171–76.

On December 20, 1990, the New York State Insurance Department sent Empire a letter describing the practice increasingly employed by labor unions of enrolling members of the public as "associated members" under their group insurance contracts with Empire. See Trial Exh. 6. Thereafter, on February 13, 1991, Empire notified Soanes that it was raising the premium rates on contracts 80542 and 82079 because of the

---

7. By April 1991, Local 906 had 4,408 associated members enrolled under contract 82079. See Affidavit of Jerry Weissman Sworn to November 11, 1991 ("Weissman Aff.") ¶ 23.

8. In addition to the $12 monthly union dues, associated members paid 40% more for their insurance than Empire charged in premiums on contract 82079. See Defendant's Third Party Complaint ("Deft. Third Pty. Compl.") (*Empire I*) ¶ 18; Weissman Aff. ¶ 27. Finders and individual insurance brokers retained the difference as commissions. See Deft. Third Pty. Compl. I ¶ 19; Trial Exh. A ¶ 27.

9. One issue in the trial was whether Soanes had been aware of Sprei's, Lieber's, and the corporate defendants' involvement with Local 1–J. It should be noted that there is no evidence that Soanes ever met the union leaders of Local 1–J. However, all of the applications for associated membership with Local 906 were sent from Sprei, Lieber, and/or the corporate defendants to Soanes. Printed on some of these applications were the names of Local 906 and Local 1–J listed together at the same address. See Tr. at 211.

rapid increase in enrollment. *See* Trial Exh. 9. On March 6, 1991, Empire explained that these contracts provided for a rate increase in the event that the number of covered members increased. *See* Trial Exh. 11. On April 9, 1991, Empire rescinded the rate increase. *See* Trial Exh. 13.

In March 1991, Sprei contacted CNA Insurance Company ("CNA") about switching the Local 1–J plan from Empire to CNA. *See* Tr. at 451–52. In order to solicit a rate quotation from CNA, Sprei fraudulently submitted a false claims history based exclusively on regular members rather than associated members, who posed greater insurance risks. *Id.* at 454–55. On or about May 1, 1991, dissatisfied with its experience with Sprei and Lieber, Local 1–J and its trustees attempted to sever their relations with Sprei, Lieber and the corporate defendants. *Id.* at 567–68. Nevertheless, Sprei submitted an application dated May 15, 1991, to CNA on behalf of Local 1–J by forging the signature of the Local 1–J president. *Id.* at 458–63, 546–48. Relying upon this information, CNA issued Local 1–J an application for a new group policy in the spring of 1991. *Id.* at 453–59. CNA allegedly lost between $300,000 and $500,000 on this group insurance contract. *Id.* at 467.

On April 30, 1991, Empire terminated both contracts 80542 and 82079 because it believed that individuals who were not regular members of Local 906 were enrolled under the contracts. *See* Trial Exh. 15. The Local 906 Fund and its trustees brought the instant action in the New York State Supreme Court on May 1, 1991, seeking to enforce contracts 80542 and 82079 and require payment of claims filed thereunder.[10] *See* PTO, Undisputed Facts ¶ 49. By signed stipulation dated May 30, 1991 (the "May 30, 1991 Stipulation"), the parties agreed that these contracts were in full force and effect, but Empire reserved its right to litigate the issue of coverage for associate members. *See* Trial Exh. 16; PTO, Undisputed Facts ¶ 50.

Empire received a total of $3,014,670.78 in premiums from associate members under contract 82079, see Tr. at 343; PTO, Undisputed Facts ¶ 54, including approximately $1,000,000 in premiums received after the May 30, 1991 Stipulation was executed, through June 1991, when contract 82079 expired. See PTO, Undisputed Facts ¶ 54. To date, Empire has neither paid any claims nor returned any of the premiums collected from associate members under contract 82079. *See* Pltf. Memo. at 3; Tr. at 435–37.

In May 1991, Sprei contacted State Mutual Life Assurance Company of America ("SMA") in order to transfer individual coverage for Local 906 from Empire to SMA. *See* Tr. at 578–79; Trial Exh. AO ¶ 11. On June 20, 1991, Sprei met with an SMA representative at the latter's request. *See* Tr. at 187, 618–19; Trial Exh. AO ¶¶ 25–26. Sprei brought Soanes to this meeting. *See* Tr. at 187, 596. The evidence at trial established that although Soanes was present at this meeting as a representative of Local 906, he did not take part in the contract negotiations. *Id.* at 187, 619.

Apparently unbeknownst to Soanes, Sprei submitted to SMA a fact sheet for contract 82079 which failed to reflect the actual claims history of Local 906 associate members. *See* Tr. at 401–406, 583; Trial Exh. CW. This fact sheet indicated that the coverage period for contract 82079 was July 1, 1988 through June 30, 1990. *See* Trial Exh. AQ. In truth, however, coverage under contract 82079 had not begun until November 1990. *See* Tr. at 406; PTO, Undisputed Facts ¶ 21. Soanes signed the application for insurance coverage by SMA, although he denies involvement in the negotiations for coverage. *See* Tr. at 187–92. Relying upon the forged fact sheet, SMA issued the Local 906 Fund an application for a new group policy. *See id.* at 585–87. As a result of this fraudulent scheme, SMA lost several million dollars. *See id.* at 588; Sept.1994 Tr. at 13–14.

In December 1991, Sprei and Lieber took the Local 906 associate members insured under the SMA contract and enrolled them as members in a newly formed labor union, Local 1214, in New Jersey. *See* Tr. at 279–

---

**10.** Only regular members of Local 906 were enrolled under contract 80542. See Weissman Aff. ¶ 25. Because Empire has processed and paid all claims thereunder, *see id.,* contract 80542 is not in dispute.

80; PTO ¶ 139. That same month, Sprei and Lieber obtained a group health insurance contract for Local 1214 (the "Local 1214 contract") from Blue Cross and Blue Shield of New Jersey ("New Jersey Blue Cross"). *See* PTO ¶ 140. In July 1992, New Jersey Blue Cross stopped paying claims under the Local 1214 contract, and shortly thereafter brought an action to rescind the Local 1214 contract. *Id.* ¶ 141.

After a four–day bench trial concluding May 5, 1994, the Court found the corporate defendants AMBGI, AEGBA, and GNEBG in default for failure to appear at trial represented by counsel in violation of Fed.R.Civ.P. 55(a).[11] *See Shapiro, Bernstein & Co. v. Continental Record Co.*, 386 F.2d 426, 427 (2d Cir.1967) ("[A] corporation cannot appear other than by its attorney").

After summations and post–trial briefing, the Court made findings of fact and conclusions of law on the Record. Based upon the evidence at trial, the Court found that in negotiating contract 82079, Empire reasonably relied on Soanes' misleading statements in September 1990 that contract 82079 would cover regular members, *i.e.,* the same class of people that Empire had contracted to cover since 1965. *See* Sept. 1994 Tr. at 13. The Court further found that Soanes' failure to affirmatively disclose to Empire the true nature of associated membership and the large numbers of associated members that would be recruited from the general public was a half truth designed and intended to deceive Empire. *Id.* The Court also concluded that Soanes' concealment of the existence of associated members from two federal agencies further demonstrated that he, Sprei and Lieber had a fraudulent intent to deceive Empire. *See* Tr. at 92–97; Sept.1994 Tr. at 12–14.

The Court also held that the evidence demonstrated that the forms supplied to Empire by Soanes fraudulently misrepresented that the claimants under contract 82079 were regular members, when in fact, they were associated members. *See* Tr. at 37, 154. The Court rejected the claim that, by entering into the May 30, 1991 Stipulation, Empire had waived its right to litigate the issue of coverage for associated members. In addition, because the Court found that associated members were not covered by the terms of contract 82079, plaintiffs' request for the payment of claims filed by associated members thereunder was rejected.

Presently at issue are 1) Empire's third–party claims against Sprei, Lieber, Soanes and Local 906 and the Local 906 Fund based upon RICO, RICO conspiracy, fraud and contract,[12] and 2) the insured's request for return of premiums.

## DISCUSSION

I. Title 18 U.S.C. § 1962(c)

Section 1962(c) of RICO makes it unlawful "for any person employed by or associated with any enterprise ... to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c) (1984). To establish liability under § 1962(c), a plaintiff must show that (1) the enterprise is one affecting interstate or foreign commerce, (2) the defendant "participated in the conduct of the enterprise's affairs," and (3) that he participated "through a pattern of racketeering activity." *Aetna Cas. Surety Co. v. P & B Autobody*, 43 F.3d 1546, 1558 (1st Cir.1994).

Under RICO, an enterprise is defined as "any individual, partnership, corporation, association, or other legal entity, and any

---

11. Empire also sought default judgment against Sprei and Lieber, who failed to participate in the preparation of the Joint Pretrial Order but appeared at trial. The Court denied Empire's application for judgment by default but restricted the issues at trial to those set forth in the Pretrial Order. *See* Tr. at 11–12.

12. At summations, the Local 906 Fund argued that Empire failed to assert RICO claims against it. However, a review of the Amended Answer

and Counterclaims reveals that Empire did assert those claims against the Local 906 Fund. *See* Am. Ans. I ¶¶ 167–80. In addition, at summations Empire waived any claim for rescission of contract 82079 on the ground of fraudulent inducement. *See* Sept. 1994 Tr. at 35. As a result, the contract issue became one of eligibility for coverage and the right to retain premiums paid thereunder. *See id.*

union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4) (1984). A RICO enterprise can encompass both legitimate and illegitimate entities. *See United States v. Turkette,* 452 U.S. 576, 590, 101 S.Ct. 2524, 2532, 69 L.Ed.2d 246 (1981).

■ To establish liability under § 1962(c), a plaintiff must prove a defendant participated in the "operation or management" of a RICO enterprise. *See Reves v. Ernst & Young,* 507 U.S. 170, 179, 113 S.Ct. 1163, 1170, 122 L.Ed.2d 525 (1993). To establish participation, a plaintiff must show that a defendant played some role in directing the affairs of an enterprise by " 'participat[ing], directly or indirectly, in the conduct of such enterprise's affairs.' " *Id.* (quoting 18 U.S.C. · § 1962(c) (1984)). *See also United States v. Viola,* 35 F.3d 37, 40–41 (2d Cir.1994) ("[S]imply aiding and abetting a violation is not sufficient to trigger liability .... ") (citing *Reves,* 507 U.S. at 179, 113 S.Ct. at 1170), *cert. denied,* 513 U.S. 1198, 115 S.Ct. 1270, 131 L.Ed.2d 148 (1995).

■ Here, the evidence at trial established the existence of an enterprise among Sprei, Lieber and the corporate defendants (the "overall enterprise"). In conducting the overall enterprise, those defendants conspired to and did approach a series of insurance companies and made misrepresentations in order to obtain low–cost insurance coverage for members of the public who would not otherwise qualify for such favorable insurance coverage. See Sept. 1994 Tr. at 14–15; Transcript of Record dated January 13, 1995 ("Jan.1995 Tr.") at 3.

To effectuate this scheme, Sprei and Lieber, acting as full partners in the enterprise, enrolled associated members with Local 1–J and Local 906 for the sole purpose of obtaining group insurance which in the past had been issued only to regular union members. In doing so, Sprei and Lieber treated the two unions' group health insurance contracts as one. As set forth above, Sprei enrolled Local 906 associated members for individual coverage to take advantage of the lower individual rates offered under contract 82079. Although contract 82079 offered family coverage, Sprei enrolled associated members

seeking family coverage under Local 1–J's contracts 82074 and 82075 to take advantage of the lower family rates available under those policies.

Sprei, Lieber and the corporate defendants carried out the overall enterprise over a significant period of time by approaching and procuring contracts from numerous insurance companies, soliciting various unions for inclusion in the scheme, recruiting associated members from the general public and administering the insurance contracts. It follows that Empire has established that the racketeering enterprise, composed of Sprei, Lieber and the corporate defendants, posed a specific threat of repetition, extended indefinitely into the future, and formed a part of the ongoing entity's regular way of doing business. See Sept. 1994 Tr. at 14–15, 51.

■ Moreover, Sprei and Lieber continued to conduct the enterprise after Empire terminated its contracts with Local 1–J and Local 906 in June 1991. *See H.J., Inc. v. Northwestern Bell Tel. Co.,* 492 U.S. 229, 242, 109 S.Ct. 2893, 2902, 106 L.Ed.2d 195 (1989) (affirming that a RICO cause of action requires a showing of continuity). Thus, Sprei convinced CNA, SMA, and New Jersey Blue Cross to cover the associated members. In that endeavor, Sprei forged Empire fact sheets in order to obtain insurance from CNA and SMA. In conducting the overall enterprise, Sprei, Lieber and the corporate defendants also violated the federal statutes prohibiting mail fraud, see 18 U.S.C. §§ 1341 and 1343 (1984), by, *inter alia,* mailing forged applications to CNA and SMA. *See* Sept. 1994 Tr. at 51. Thereafter, Sprei continued the enterprise by enrolling the former Local 906 associated members under a New Jersey Blue Cross policy with Local 1214, a newly formed labor union. *See* Tr. at 279–80. In short, all the requirements of RICO are found to be established, including numerous requisite predicate acts.

■ However, Empire has failed to prove that Soanes participated in that overall enterprise. Soanes' participation was limited to independently negotiating and procuring contract 82079 from Empire. *See* Tr. at 272. There is no proof whatsoever that Soanes

participated or managed the RICO enterprise referred to above. At best, the evidence establishes that Soanes was deliberately and recklessly indifferent to whether the fraud in which he participated was part of a larger fraud involving Local 1–J and other insurance companies. Indeed, at one point, without Soanes' knowledge, Sprei contacted CNA and SMA, representing to the latter that he was a representative of Local 906. *See* Tr. at 452, 579.[13]

It follows that while Soanes' acts "might have contributed to the success of the RICO enterprise, he simply did not come within the circle of people who operated or managed the enterprise's affairs." *Viola*, 35 F.3d at 43. Although the "operation and management" test attaches liability to those down the "ladder of operation" who nonetheless played some operational role, it is clear that Soanes' isolated involvement with the Empire contracts is insufficient to impose upon him liability for the full RICO enterprise. *See Reves*, 507 U.S. at 184 n. 9, 113 S.Ct. at 1173 n. 9; *Viola*, 35 F.3d at 43.[14] In sum, while Soanes may arguably have aided and abetted the fraudulent activities of the RICO enterprise, that conduct is insufficient to sustain a RICO claim against him.

## II. Title 18 U.S.C. § 1962(d)

Section 1962(d) of RICO makes it unlawful "for any person to conspire to violate any of the provisions of subsections (a), (b), or (c) of this section." 18 U.S.C. § 1962(d) (1984). To establish liability under § 1962(d), a plaintiff must prove a defendant and another "agree[d] to commit the substantive racketeering offense through agreeing to participate in two predicate acts .... and [knew] the general nature of the conspiracy

and that the conspiracy extends beyond his individual role." *United States v. Rastelli*, 870 F.2d 822, 828 (2d Cir.1989). A plaintiff need not establish that each member of a conspiracy conspired directly with, or even knew, every other member of the conspiracy. *See id.; United States v. Friedman*, 854 F.2d 535, 562 (2d Cir.1988). In order to demonstrate a RICO conspirator's knowledge of the RICO conspiracy, it is sufficient for plaintiff to prove "that the defendant know[s] the general nature of the enterprise and know[s] that the enterprise extends beyond his individual role." *Rastelli*, 870 F.2d at 828. Proof of a single conspiracy requires evidence that the alleged co–conspirators "agreed on a 'common purpose' that sufficed to render their activities 'a single enterprise.'" *United States v. Heinemann*, 801 F.2d 86, 92 (2d Cir.1986) (quoting *Kotteakos v. United States*, 328 U.S. 750, 769, 66 S.Ct. 1239, 1250, 90 L.Ed. 1557 (1946)).

As set forth above, Empire has established that a RICO conspiracy existed between Sprei, Lieber and the corporate defendants, all of whom had knowledge of the general nature and extent of the conspiracy. The Court has already held that Sprei and Lieber concocted the RICO scheme together, acting as full partners. *See* Trial Exh. A ¶ 2. Soanes knew that Sprei signed up associated members under the Local 906 Fund group insurance coverage even though they were not union members. *See* Tr. at 81. Furthermore, Soanes' knowledge of the illegal nature of the contracts between Local 906 and Empire is demonstrated by the fact that he did not report the associate members to the federal government as Local 906 members but did report them as regular members for in-

---

**13.** Although Soanes was present at a meeting in which Sprei negotiated a new contract with SMA, that evidence falls short of establishing Soanes' participation and management of the overall fraudulent scheme. *See Reves*, 507 U.S. at 186, 113 S.Ct. at 1173–74; *Viola*, 35 F.3d at 43.

**14.** Empire's assertion that Soanes' participation in the RICO enterprise is established by the fact that he, Local 906 or the Local 906 Fund benefitted from the activities of the overall enterprise must also be rejected. Empire points to the fact that the increase in membership resulted in, *inter*

*alia,* an increase in union dues revenues and an increase in Soanes' salary as union president. However, the mere fact that Soanes benefitted from the enterprise by, for example, receiving a salary increase, is insufficient to make Soanes a participant, especially where, as here, the Finder and Administrative Agreements, *see supra* n. 5, afforded Soanes no financial stake in the fraudulent scheme that Sprei, Lieber, and the corporate defendants carried out with other unions. *See Reves*, 507 U.S. at 179, 113 S.Ct. at 1170; *Gruber v. Prudential–Bache Sec.*, 679 F.Supp. 165, 181 (D.Conn.1987).

surance purposes. *See id.* at 103. However, these facts do not establish that Soanes was a member of the broader RICO conspiracy dealing with numerous insurance companies as described above. This is especially true since under the Finder and Administrative Agreements, Soanes had no connection with or financial interest in the affairs of the corporate defendants or of Sprei and Lieber, other than with respect to Local 906. In sum, Sprei, Lieber, and the corporate defendants were free to pursue other financial arrangements, even those that were in competition with Soanes and Local 906.[15] That being so, a finding that Soanes shared a common purpose with respect to insurance contracts other than contract 82079 is not supported by the evidence.

The Court concludes that Empire has not proven that Soanes was a member of the RICO conspiracy alleged. It follows that since Empire has failed to establish RICO liability with respect to Soanes, its claims that Local 906 and the Local 906 Fund are vicariously liable under RICO must likewise be rejected.[16]

▮ In *Empire I*, Empire asserts third-party claims for damages against Local 906, the Local 906 Fund and its trustees for fraud and breach of contract in relation to contract 82079. However, these claims must be dismissed because Empire cannot establish damages. It is undisputed that Empire received over $3,000,000 in premiums under contract 82079, and paid no benefits on claims filed thereunder. That Empire sustained damages in relation to the contracts with Local 1–J is irrelevant to the question of whether Empire was damaged by any alleged fraud in connection with contract 82079.

## III. RETURN OF PREMIUMS

With regard to the contract claims, Empire has waived its claim for rescission and seeks only an adjudication of eligibility of associated members for coverage under the contract. See Sept. 1994 Tr. at 36. The Court has found that, in view of the fraud perpetrated, the associate members' claims are not covered by contract 82079 because Empire never agreed to insure anyone other than regular members of the union.

In view of that finding, Local 906, the Local 906 Fund and the individual insured plaintiffs seek return of the premiums paid under contract 82079. Plaintiffs argue that because Empire collected $3,014,670.78 in premiums on contract 82079 and paid no claims filed thereunder, principles of insurance law, contract law and equity require the return of those premiums. Plaintiffs contend that Empire must return all of the premiums paid, or at a minimum, the approximately $1,000,000 in premiums paid by the Local 906 Fund to Empire after May 30, 1991, the date Empire and the Fund entered into the May 30, 1991 Stipulation in which Empire agreed to reinstate contract 82079 in full force and effect. *See* PTO ¶¶ 1–9 at 4–7; *id.*, Undisputed Facts ¶ 50.2; Trial Exh. 16. Empire contends that it need not return any premiums paid on contract 82079 because the individual insureds are bound by the fraudulent acts of their agents, Local 906 and Soanes.[17]

---

**15.** That applications for Local 906 associated members approved by Soanes and that circulated through his office bore Local 1–J's name does not change the outcome. *See* Tr. at 211. Soanes testified that he had not noticed the name on the forms, which were processed by a clerical worker, and that he was not familiar with Local 1–J until this litigation began. *Id.* at 33. The Court credits that testimony.

**16.** With regard to the fraud claims asserted against Sprei, Lieber and the corporate defendants, Empire has clearly established that each of these defendants knowingly made materially false representations with an intent to defraud in connection with, *inter alia*, the contracts between Local 1–J and Empire, and that Empire reasonably relied upon these misrepresentations resulting in damages to Empire. *See, e.g., Diduck v. Kaszycki & Sons Contractors, Inc.*, 974 F.2d 270, 276 (2d Cir.1992); *Junius Constr. Co. v. Cohen*, 257 N.Y. 393, 400, 178 N.E. 672 (1931) (fraudulent misrepresentations established by half truths).

**17.** In addition, Empire argues that it is contractually entitled to retain excess premiums pursuant to a provision in contract 82079 which provides: "At the end of each contract period ... [Empire] may, at [its] option, provide a retroactive reduction in subscription charges (a refund) for that contract period if warranted by the experience of your group." Affidavit of Max Goldweber, Exh. A at Art. V, § H(3). However, the Court finds that that provision is inapposite,

 Under New York law, a broker who procures an insurance policy on behalf of an insured is the agent of the insured, not the insurer. *See Salzano v. Marine Ins. Co.*, 173 A.D. 275, 159 N.Y.S. 277, 281 (1916); 16 Appleman, *Insurance Law and Practice* § 8728 (1981). Any fraud or misrepresentation by the broker is therefore binding on the insured. *See Hayat Carpet Cleaning Co. v. Northern Assurance Co. Ltd. of London*, 69 F.2d 805, 805 (2d Cir.1934); *Amalgamated Mut. Cas. Co. v. Schultz*, 27 Misc.2d 208, 207 N.Y.S.2d 890, 892 (Sup.Ct.1960). Indeed, an insured is responsible for the insurance-related misrepresentations made by his broker to the insurer, even if the broker had no authority to make those misrepresentations. *See Schultz*, 207 N.Y.S.2d at 892.

 Moreover, under New York law, an insurer may rescind the insurance contract if the insured made misrepresentations which were material to the risk insured, *see Guzman v. American Life Ins. Co.*, 156 A.D.2d 332, 548 N.Y.S.2d 284, 285 (1989); *Kulikowski v. Roslyn Sav. Bank*, 121 A.D.2d 603, 503 N.Y.S.2d 863, 864, *appeal dismissed*, 69 N.Y.2d 705, 512 N.Y.S.2d 364, 504 N.E.2d 691 (1986), notwithstanding the fact that the misrepresentations were unintentional. *See Eastern Dist. Piece Dye Works v. Travelers' Ins. Co.*, 234 N.Y. 441, 449–50, 138 N.E. 401 (1923); *Kulikowski*, 503 N.Y.S.2d at 864; *Barrett v. State Mutual Life Assur. Co.*, 58 A.D.2d 320, 396 N.Y.S.2d 848, 851 (1977), *aff'd*, 44 N.Y.2d 872, 407 N.Y.S.2d 478, 378 N.E.2d 1047 (1978); *Fernandez v. Windsor Life Ins. Co. of America*, 83 Misc.2d 301, 372 N.Y.S.2d 357, 361 (Sup.Ct.1975), *aff'd*, 52 A.D.2d 589, 382 N.Y.S.2d 120 (1976). However, it is also well established that an insurer who rescinds the contract must return a prorated portion of the unearned premiums. *See Tisdell v. New Hampshire Fire Ins. Co.*, 155 N.Y. 163, 165, 49 N.E. 664 (1898); *Van Valkenburgh v. Lenox Fire Ins. Co.*, 51 N.Y. 465, 468 (1873); *Durnin v. Aetna Life Ins.*

*Co.*, 228 A.D. 428, 240 N.Y.S. 463, 466 (1930); *C.A. Smith Lumber Co. v. Colonial Assurance Co.*, 172 A.D. 149, 158 N.Y.S. 198, 199 (1916).

In the instant case, Empire specifically chose not to rescind the contract and stipulated that the contract was "in full force and effect." [18] Trial Exh. 16. Instead it entered into a Stipulation that, fairly read, permitted Empire to retain the premiums already collected, as well as an additional $1,000,000 in premiums paid thereafter, pending a judicial determination as to whether or not it would be obliged to pay claims under contract 82079. *See id.*

It has now been determined, however, that Empire has no liability for any such claims. Nevertheless, Empire argues that, under New York law, where an insured or its agent makes a misrepresentation, the insured is not entitled to a return of premiums. While it is true that New York cases have held that a determination that a *certain risk* is not covered by an insurance policy does not entitle the insured to a return of a portion of the premium, *see Foster Wheeler Corp. v. Home Ins. Co.*, 72 A.D.2d 693, 421 N.Y.S.2d 363, 364 (1979), here Empire does not claim that contract 82079 does not cover a particular risk. Rather, Empire has claimed, and the Court has found, that contract 82079 does not cover ,the insureds at all, and that therefore *no risk of insurance* was ever assumed by Empire.

 Empire cites no case that would support its proposition that it need not return the premiums where, as here, no risk of insurance ever attached, the insureds did not themselves participate in the fraud, and the insurer continued to accept premium payments after it knew or should have known of the fraudulent activity of the insured's agent.

Indeed, there is case authority in New York holding that an insurance company is not entitled to accept premiums and at the

---

where, as here, Empire claims that *every person* insured under contract 82079 is ineligible. That clause clearly was designed to permit Empire, in its discretion, to refund premiums when some claims were paid but where the premiums charged turned out to be higher than the claims experience would justify.

**18.** As set forth above, in response to the Court's questioning at Summations, Empire waived any claim for rescission that it might have had because contract 82079 had been fraudulently induced. *See* Sept. 1994 Tr. at 36.

same time repudiate the insurance contract after it has acquired knowledge of the fraud. *See Flannigan v. Prudential Ins. Co. of America,* 20 Misc. 539, 46 N.Y.S. 687, 688 (Albany County Ct. 1897) (holding, in dictum, that if at the time the policy was issued the insurer knew of insured's fraud and continued to accept premiums, insurer would be estopped from asserting fraud as a defense to coverage, and payment on claims would be required). *See also Palmer v. Metropolitan Life Ins. Co.,* 21 A.D. 287, 47 N.Y.S. 347, 348 (4th Dep't 1897) (noting, in dictum, that an insurer aware of the fraud would be estopped from asserting the falsity of a statement on an insurance application as a defense).

In this case the conclusion is inescapable that Empire knew or should have known of the fraud when it continued to accept premiums under contract 82079 after the May 30, 1991 Stipulation was executed. Indeed, based upon the evidence elicited at trial, the Court could reasonably infer that Empire knew or should have known about the fraud as early as February or March 1991.

An internal office memorandum from Empire Vice President Richard Dunn ("Dunn") written in August 1990, two and a half months prior to the effective date of contract 82079, reveals that Empire had knowledge of the growing practice of enrolling associate members into unions for the purpose of seeking discount health benefits. See Trial Exh. 5. Moreover, in December 1990, the New York State Insurance Department (the "Department") wrote to Empire after the Department received an inquiry concerning the associate membership program of Local 1–J. See Trial Exh. 6. In response, Empire Vice–President and Associate General Counsel Jerrold I. Ehrlich informed the Department by letter dated January 8, 1991 that Empire was currently rewriting its underwriting manual so as to clarify its intentions that associate members are not eligible for coverage. *See* Trial Exh. 7. In addition, in or about January 1991, the Department notified Empire that members of the public were being offered coverage under an Empire policy as associated members of Local 1–J. *See* Trial Exh. 6. Thereafter, a series of correspondence ensued between Dunn and Sprei

in relation thereto. *See* Trial Exhs. 8, BL, BM.

Moreover, Empire became suspicious of the fraud when enrollment under contract 82079 began to increase rapidly. *See* Trial Exh. 8 at 1. Thereafter, in February 1991, Dunn informed Soanes by letter that Empire intended to increase the premium rate. *See* Trial Exhs. 9, 19 at 38–39. Thus, on February 13, 1991, Dunn wrote a letter to Soanes as Administrator of the Local 906 Fund, stating that Empire was increasing rates on both contracts 80542 and 82079 due to the dramatic rise in enrollment. *See* Trial Exh. 9; PTO, Undisputed Facts ¶ 43. In March 1991, counsel for Local 906 and Empire corresponded back and forth by letter about the rate increases, *see* Trial Exh. 9, and on April 9, 1991, Empire rescinded its rate increase. *See* Trial Exh. 13.

Furthermore, on April 24, 1991, Sherry Winston of The Kooper Group, an insurance brokerage firm, sent Empire a carbon copy of a letter she had sent to Sprei, asking, *inter alia:*

> Has Empire Blue Cross/Blue Shield, in fact agreed in writing to continue coverage under the "Local 906" plan, for associate member [sic] currently insured under "Local 1–J."

> Has Empire Blue Cross/Blue Shield agreed in writing to continue coverage under the "Local 906" plan for all corporations not to be underwritten under the new CNA plan.

Post–Trial Reply Brief of Empire Blue Cross/Blue Shield ("Deft. Reply Brief") at 7.

Finally, on April 30, 1991, in response to this information, Empire sent a letter to Local 906, attempting to rescind contract 82079 based upon its knowledge of the fraud. *See* PTO, Undisputed Facts ¶ 48. This letter stated in pertinent part:

> [W]e have information that individuals are not being enrolled pursuant to the eligibility provisions of the application and contract, and that individuals who are not members of Local 906 are, or will be allowed to enroll in that group. These enrollment practices are a breach of the pro-

visions of our contractual arrangements with you.

Trial Exh. 15.

■ Based upon these events, the Court concludes that Empire had full knowledge of the insurance fraud when it signed the May 30, 1991 Stipulation. Therefore, the Court rejects Empire's claim that it is entitled to retain all of the premiums it received, including those premiums paid after May 30, 1991.

This is especially true since in the May 30, 1991 Stipulation, Empire rescinded the termination of contract 82079, stating, *inter alia,* that contract 82079 was in full force and effect, and reserved its right to litigate the issue of whether or not associate members were properly covered under the policy. It is clear that since, certainly as of that date, Empire had the right to rescind the contract, its decision not to do so was obviously designed for the strategic advantage of obtaining additional security, not for contract 82079, but for losses it had already sustained on the Local 1–J contracts.

Moreover, under the laws of the State of New York, had Empire rescinded contract 82079 at that time, it would have been required to tender back premiums paid under the policy, and possibly all such premiums because no claims had yet been paid under this contract. Therefore, it is not surprising that Empire chose not to rescind. However, Empire, not the insureds, should bear the consequences of that choice. This is especially true since New York law might well support estopping Empire from denying coverage for claims arising after that date. *See supra* p. 243.

■ Empire also argues that if the Court directs the return of premiums, Empire should be allowed to set off any premiums owed to the Local 906 Fund under contract 82079 (about $1,000,000) against the liability of Sprei, Lieber and the defendant corporations (about $13,000,000) arising out of the Local 1–J contracts. However, this argument rests on cases holding that when

an insurance company rescinds on grounds of fraud, it may, before returning premiums, offset losses incurred on the policy which was obtained by fraud. *See Borden v. Paul Revere Life Ins. Co.,* 935 F.2d 370, 379 (1st Cir.1991); *Mincho v. Bankers' Life Ins. Co.,* 129 A.D. 332, 113 N.Y.S. 346, 348 (1908); *see also Seff v. National Org. of Indus. Trade Unions Ins. Trust Fund,* 781 F.Supp. 1037, 1043 (S.D.N.Y.1992). However, these cases are not relevant where, as here, the losses which Empire seeks to set off were not incurred under the policy allegedly obtained by fraud, but instead were incurred under different policies. The Court concludes, therefore, that at the very least, Empire must return the approximately $1,000,000 in premiums received after May 30, 1991. The evidence might well justify disgorgement of premiums received at an earlier date. However, since May 30, 1991 is the date when Empire concededly, with full knowledge of the fraud, made the strategic choice not to rescind, the Court, in its discretion, finds that date as the most appropriate disgorgement date.[19]

## CONCLUSION

For the reasons set forth above, the Court finds that AMBGI, GNBGI, AEGBA, Sprei and Lieber are jointly and severally liable for the RICO, RICO conspiracy, and fraud claims. While the Court orders that all premiums accepted after May 30, 1991, be returned by Empire, the Court is aware that this case involves many innocent insureds whose agents engaged in a massive fraud. Therefore, Empire is directed to pay all premiums collected under contract 82079 after May 30, 1991, plus interest, to the Clerk of Court to be held for distribution to the insureds upon the exhaustion of all appeals in this action, and in a manner either agreed upon by the parties or to be determined by the Court.

Further, for the reason set forth above, the Clerk of Court is directed to enter a

---

**19.** This is especially appropriate in light of the fact that Empire previously argued in support of its motion for summary judgment that contract 82079 was not valid under New York law. Had Empire been successful in that argument, it would have had to return all of the premiums received under contract 82079 pursuant to New York law. *See O'Connor Transp. Co. v. Glens Falls Ins. Co.,* 204 A.D. 56, 197 N.Y.S. 549, 550 (1922).

default judgment for third-party plaintiff Empire in *Empire I,* 91 Civ. 8698(JES), against AMBGI, GNBGI and AEGBA for their failure to appear at trial represented by counsel, and to dismiss with prejudice the claims asserted by AEGBA in *Empire III,* 92 Civ. 422(JES), for failure to appear at trial represented by counsel.

It is **SO ORDERED.**